

Troutman Pepper Hamilton Sanders LLP
301 S. College Street, Suite 3400
Charlotte, NC 28202

troutman.com

---

**Jason D. Evans**
D 704.916.1502
jason.evans@troutman.com

April 6, 2021

**VIA EMAIL (to Irving_Brenner@ncwd.uscourts.gov)**

The Honorable Kenneth D. Bell
U.S. District Court for the Western District of North Carolina
7200 Charles R. Jonas Federal Building
401 West Trade Street
Charlotte, NC 28202

      RE**:**   *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC, et. al.*
             Case No. 3-19-cv-515-KDB-DSC

Dear Judge Bell:

      On behalf of the Duke Energy parties ("Duke") in the above-referenced matter, I write regarding Duke's summary judgment motion filings made on Monday and as a result of the attached letter received from NTE's counsel (Mr. Baughman) last night. Mr. Baughman's letter essentially accuses Duke of not following rule requirements with respect to its summary judgment brief and related Appendix (Dkts. 191-194) and threatens the filing of a motion to strike. Duke disagrees and believes its filings comply with all applicable requirements. While Duke regrets taking the Court's valuable time, we believe it important to address the issue with the Court expeditiously given upcoming deadlines, including Duke's deadline to file a motion to seal in the coming days in compliance with last Friday's text order. If the Court requires any modification to Duke's filings, Duke will of course make any modification(s) promptly and re-file. Duke responds to each of the points in Mr. Baughman's letter below.

      *First*, Mr. Baughman accuses Duke of not complying with the Court's formatting requirements pursuant to Local Civil Rule 7.1(d). Upon receiving Mr. Baughman's letter last night, I checked the formatting settings in Duke's brief and found, as expected and as required, that the brief is formatted with 1" margins on all sides and uses a 12-point proportional font (Times New Roman), which is not "compress[ed]." Mr. Baughman speculates that Duke's brief is not appropriately double spaced, but it in fact is. The brief was formatted in Microsoft Word using a line spacing setting of exactly 24 point, meaning each line on the page takes exactly double the space of the required 12-point font. *See, e.g.*, Matthew Butterick, *Typography for Lawyers* (2d ed.), typographyforlawyers.com/line-spacing.html ("So if you're required to use a

April 6, 2021
Page 2



---

12-point font, double line spacing means 24 points. . . . To get accurate spacing, you should always set it yourself, exactly.").

 Mr. Baughman essentially says that Duke's brief nevertheless has too many lines on the page in his view, but this Court's local rule does not specify a maximum number of lines per page. Other federal courts have specified that a double-spaced brief using similar formatting requirements as apply in this district may result in up to 28 lines per page, which Duke's brief does not exceed.[1] Duke thus believes that its brief complied with all formatting requirements.

 *Second*, Mr. Baughman apparently seeks to impose requirements on Duke's brief that are not found in this Court's local rules. In addition to his references to the number of lines per page (addressed above), he also suggests that Duke's brief has too many words, when in fact this Court has no word count requirement, and he makes an additional statement about footnote spacing when there is no rule requirement on that point either.[2]

 *Third*, Mr. Baughman accuses Duke of using footnotes in some supposedly improper manner, when in fact the local rule and Your Honor's Standing Order expressly acknowledge that parties may use footnotes. Duke's brief complies with the formatting requirements of using 12-point font in the footnotes. Nor is it improper to put citations in footnotes—a practice advocated by the most prominent authority on legal writing.[3] Further, the case on which NTE relies applies local rules from another district, which have no bearing here. *See SMD Software, Inc. v. EMove, Inc.*, No. 5:08-CV-403-FL, 2010 U.S. Dist. LEXIS 54736, at *1-2 n.1 (E.D.N.C. June 1, 2010) (addressing the page "limit on memoranda supporting discovery motions under Local Civil Rule 7.1 (e), E.D.N.C."). Duke's brief is also clearly distinguishable to the submission in *SMD*, as Duke did not place all of its citations in footnotes or exceed the page limit. *See id.* (considering plaintiff's submission notwithstanding the fact that its fifteen-page

---

[1] For example, the local rules for the Northern and Central District of California, as well as for the Districts of Arizona and Nevada, mandate that documents shall be "double-spaced with no more than 28 lines per page." *See* N.D. Cal. Local Civil Rule 3-4(c)(2); C.D. Cal. Local Civil Rule 11-3.2; D. Ariz. Local Civil Rule 7.1(b)(1); D. Nev. Local Civil Rule 10-1(a)(1); *see also Sameer v. Khera*, No. 117CV01748DADEPG, 2018 WL 3472557, at *1 (E.D. Cal. July 18, 2018) (noting that local rule requiring all documents to be double spaced means that the "line spacing of such documents . . . must be double spaced meaning, at minimum, 24-point line spacing" (emphasis omitted)). On pages without footnotes, Duke's brief includes up to 27 lines in the double-spaced format described herein.

[2] The footnotes in Duke's brief are formatted in single-spaced format without any other text or spacing compression.

[3] *See* Bryan A. Garner, "Textual citations make legal writing onerous, for lawyers and nonlawyers alike" (Feb. 1, 2014), https://www.abajournal.com/magazine/article/textual_citations_make_legal_writing_onerous_for_lawyers_and_nonlawyers.



length and placement of *all* of its citations in footnotes had the effect of "circumventing ten-page limit on memoranda").

*Fourth*, Mr. Baughman takes issue with Duke's Appendix of materials filed in support of its summary judgment motion. One of his points concerns a declaration of Duke witness Angela Tabor (Appendix Ex. 255). But, Ms. Tabor's declaration merely attaches and places in the record in evidentiary form a set of correspondence exchanged between the parties regarding monies owed by NTE to Duke and that are expressly recited[4] in Duke's First Amended Complaint. That correspondence is thus highly relevant to Duke's claims and its summary judgment motion. Rule 56(c)(1)(A) of the Federal Rules of Civil Procedure specifically includes "affidavits or declarations" as the types of materials appropriately considered in a summary judgment motion.

Mr. Baughman next takes issue with the fact that Duke's Appendix includes materials not cited in Duke's brief. Duke included voluminous record citations in its brief to support its factual positions, in compliance with Rule 56(c)(1). Given the space constraints and to avoid unnecessarily duplication, Duke did not attempt to cite every part of the record that supports every factual statement. Duke's Appendix includes additional relevant record materials beyond those cited in the brief, which is not disallowed by any rule of this Court that undersigned counsel is aware of.[5] *See* Fed. R. Civ. P. 56(c)(3) (indicating that the court "may consider other materials in the record"). While discovery in this case has been extensive and thus Duke's supporting Appendix is voluminous, the Appendix pales in comparison to the total amount of discovery materials that exist.[6]

Nor do either of the cases on which NTE relies support its notion that Duke's Appendix is improper. In *Propst v. HWS Co., Inc.*, the court found that where the plaintiff filed a motion to strike which included arguments relating to the merits of the defendant's summary judgment motion, the motion to strike was an improper attempt to "wedge-in" and "incorporate[e] by reference" additional summary judgment arguments and thus circumvent applicable page limits. 148 F. Supp. 3d 506, 510 (W.D.N.C. 2015). *Propst* is inapplicable here because neither Duke's

---

[4] Two of the twenty-six letters were exchanged on February 1, 2022 and March 4, 2022, after Duke filed its First Amended Complaint. Thus, they are not included in the First Amended Complaint but are relevant to Duke's claims.

[5] For example, undersigned counsel recalls a different antitrust lawsuit before this Court where the parties transmitted many banker's boxes of record materials to the Court with their summary judgment filings. Neither the Court nor any party objected, and the Court (Judge Thornburg) granted the defendants' summary judgment motion on Sherman Act claims in that matter without any complaint or issue being raised about the voluminous set of record materials submitted. *See* Memorandum and Order, *Valuepest.com v. Bayer Corp.*, No. 1:05CV90, Docket No. 156 (W.D.N.C. July 13, 2007) (LEXIS CourtLink) (granting summary judgment for Defendants).

[6] The parties have produced over 130,000 documents, conducted more than 50 depositions, and introduced more than 775 exhibits during depositions.



brief nor its Appendix incorporate by reference or otherwise "wedge-in" additional arguments. *See id.* In *Volumetrics Med. Imaging, Inc. v. ATL Ultrasound, Inc.*, the court struck a thirty-eight page "Statement of Specific Facts" which the plaintiff had submitted with its brief in opposition to the defendant's motion for summary judgment and which, when combined with the brief, exceeded the applicable page limit. 243 F. Supp. 2d 386, 398 (M.D.N.C. 2003). *Volumetrics* does not address appendixes or prohibit the use of appendixes. *See id.* In any event, Duke included a table of contents with its Appendix to allow both the Court and opposing counsel to locate each and every document cited in its brief using a corresponding exhibit number in the Appendix. Further, as Judge Voorhees noted in *Propst*, 148 F. Supp.3d 506 at 511-12, cited in Mr. Baughman's letter, "a motion to strike is no longer the favored (or authorized) method of challenging the inadmissible nature of evidentiary submissions at the summary judgment stage. . . . . Instead, unless a local rule or standing order specifies otherwise, the parties are to make their evidentiary objections *within* their summary judgment briefing itself."

*Fifth*, Mr. Baughman correctly notes that one of the legal citations in Duke's brief inadvertently listed a case as a Fourth Circuit rather than a Sixth Circuit case. Duke regrets the inadvertent error, but in any event wishes to be clear to the Court that the *St. Luke's Hosp. v. ProMedica Health Sys., Inc.* case is in fact a Sixth Circuit, not a Fourth Circuit, decision. Duke would be happy to re-file its brief with the citation corrected if the Court wishes it to be corrected in the filed brief, in addition to this disclosure of the mistake.

We appreciate the Court's attention to this matter. For the reasons detailed above, we believe Mr. Baughman's stated concerns are entirely misplaced and that Duke's summary judgment motion filings comply with this Court's requirements in all respects. If the Court should find otherwise, however, Duke remains available to promptly correct and re-file any document in compliance with the Court's instructions.

                                                  Respectfully,

                                                  Jason D. Evans

cc:      Counsel of record

**JFB LEGAL**
The Law Offices of John F. Baughman

500 E Main Street, Suite 1400
Norfolk, VA 23510
Tel: (757) 904 5373

299 Broadway, Suite 1816
New York, NY 10007
Tel: (212) 548 3212

April 5, 2022

**VIA EMAIL**

Jason D. Evans
Troutman Pepper Hamilton Sanders LLP
301 S. College Street, Suite 3400
Charlotte, NC 28202
Jason.evans@troutman.com

RE:   *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC, et al.*

Dear Jason:

I write concerning the brief you signed and filed yesterday in support of Duke's motion for summary judgment (the "MSJ Brief"). It appears to us that Duke has manipulated the settings on its word processing system and taken other actions to evade (i) Local Rule 7.1 and (ii) the Court's March 25, 2022 order (Dkt. #188) limiting summary judgment briefs to 35 pages. We note the following:

- Under Local Rule 7.1, briefs must be double-spaced, in 12-point type, and have one-inch margins. Duke, however, apparently has skirted the rules by compressing type and not double-spacing (perhaps instead used fixed point spacing). *See Jones v. Con-Wax Freight, Inc.*, 2014 WL11220062, at *1 (W.D.N.C. 2014) (discussing compression and noting that "these rules are in place for a reason"). To illustrate this, I attach page 21 of the MSJ Brief and pages from previous briefs Duke has filed. The difference is obvious.

- Further to the above, the MSJ Brief has pages with 25, 26 and 27 lines of text (pp. 4, 30 and 29). Prior Duke briefs typically had 22 or 23 lines of text per page (see attached).

- Duke also appears to have used peculiarly small spacing between footnotes.

- It is well known that a typical page in 12-point, double-spaced type will have approximately 250 words per page.[1] By our count, your brief has 13,563 words

---

[1] *See, e.g.,* https://www.assemblymade.com/2021/01/how-many-words-is-2-pages-double-spaced-times-new-roman/ ("a good rule of thumb is . . . 250 words for a double-spaced page"); https://gradebees.com/how-many-pages-in-words/ ("it will take 250 words to fill the whole page"); https://www.wordcounttool.com/blog/word-

(including footnotes, but excluding the cover, tables and signatures). That amounts to 387.5 words per page.

- You have put the entirety of many of Duke's legal citations in footnotes—a practice that is specifically disfavored. *See SMD Software, Inc. v. Emove, Inc.*, 2010 WL 2732261, at n. 1 (E.D.N.C. 2010) (placement of all authorities in footnotes "had the effect of circumventing" Rule 7.1).

- The Local Rules do not provide for a separate appendix or other submissions in addition to a brief. There are numerous cases criticizing the use of non-standard filings to circumvent the page limits. *See, e.g., Propst v. HWS Co., Inc.*, 148 F.Supp. 3d 506, 511 (W.D.N.C. 2015) (improper use of incorporation by reference) and *Volumetrics Medical Imaging, Inc. v. ATL Ultrasound, Inc.*, 243 F.Supp. 2d 386 (W.D.N.C. 2003) (striking unauthorized statement of facts). Yet Duke appears to have submitted materials for precisely this purpose. For example, one of Duke's "exhibits"—the Declaration of Angela Tabor—is a five-page, 35-paragraph declaration apparently to supplement the "Background" section in the brief.

- Further to the above, although Duke submitted 256 "exhibits," the MSJ Brief cites fewer than 60. In other words, more than three-fourths of the exhibits are merely dumped into the record with no citation or context. There is no reason for this, and this practice is specifically disfavored. *See Propst supra* ("Plaintiff has essentially asked this Court to read everything it has filed and, after doing so, construct a coherent argument against Defendants' Motion—a task which the Plaintiff was obligated to do *within* his opposition brief").

Finally, we note that you have at least one materially incorrect citation. You say that *St. Luke's Hospital v. Promedic Health System* case was decided by the Fourth Circuit. It was not. It was a Sixth Circuit Decision.

We are inclined to file a motion to strike advising the Court of the problems with Duke's filing but want to hear your explanation first. *See McKiver v. Murphy-Brown LLC*, 2018 WL 6606061, at *5 (E.D.N.C. 2018) (manipulating the requirements "is unacceptable"). Please explain why you believe that your brief is in conformance with the rules. In order that we can fully evaluate this matter, please send us the Word version used to make the PDF that was filed.

---

count/how-many-words-in-one-page ("you will need 250 words to fill a page of a double-spaced document"); https://wordcounter.io/faq/how-many-pages-is-2000-words/ (table).

2

This is not a trivial matter. NTE will be severely prejudiced if it is forced to respond to an improper overlength brief. I respectfully request your prompt response by no later than Thursday, April 7.

Sincerely,

/s/ John F. Baughman

cc: Douglas Green
Marguerite Willis
Douglas Litvack

disparagement to rebut the presumption by showing the defendant's statements were '(1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible to neutralization or other offset by rivals.'" *Id.* at 1269 (quoting *Lenox v. MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1127 (10th Cir. 2014)). NTE fails the test.

*First*, NTE alleges that Duke made statements to potential customers suggesting that NTE's service would be less "reliable" than Duke's. NTE 30(b)(6) (Clarkson) Dep. Vol. I 72:2-17; *see also* Dkt. 123 ¶ 77. Such statements do not violate the antitrust laws, including because they are not "clearly likely to induce reasonable reliance" and are "readily susceptible to neutralization" by NTE. *Duty Free Americas*, 797 F.3d at 1269. "Like an advertisement ... the [alleged] statements implicitly touted [DEP's] strengths while calling into question the wisdom of doing business with [NTE]. As a general matter, such statements are outside the reach of the antitrust laws, however critical they may be." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 851 (7th Cir. 2011). And "[t]his analysis holds true even if [the alleged] statements about [NTE] were false," because "even false statements about a competitor serve to 'set the stage for competition.'" *Id.* (quoting *Sanderson*, 415 F.3d at 623). After all, if the alleged claims were false, then NTE "could respond with information to refute that claim." *Id.* at 852. Indeed, NTE's 30(b)(6) witness testified that NTE *did* respond to Duke's alleged statements in discussions with potential customers including FPWC. *See, e.g.*, NTE 30(b)(6) (Clarkson) Dep. Vol. II 59:18-61:8, 67:10-68:21.

*Second*, NTE complains of DEC's statement on OASIS that the LGIA had been cancelled. *See* Dkt. 123 ¶¶ 79, 124. DEC's statement was not "clearly false": DEC did terminate NTE's LGIA because of non-payment. When DEC next posted its interconnection queue, it was *required* to update it to reflect the cancellation of NTE's REC interconnection request. *See* 18 C.F.R. § 37.6(a)(1). While FERC later ruled that DEC should have gone to FERC before terminating the LGIA, that does not change that DEC did terminate it: The parties had ceased to implement the LGIA, and the project was not going forward. Moreover, NTE

21

brought under analogous statutes. *See, e.g. Hoult v. Brant*, 51 Mass. App. Ct. 1107, 746 N.E.2d 595 (Table) (2001); *PSN Ill., Inc. v. Ivoclar Vivadent, Inc.*, No. 04 C 7232, 2005 WL 2347209, at *5-6 (N.D. Ill. Sept. 21, 2005). As a result, NTE cannot avoid the absolute privilege here simply by casting defamation allegations as a UDTPA claim.

The cases NTE relies upon do not overcome application of the absolute privilege to NTE's UDTPA claim grounded in alleged disparagement. In *Mazzucco v. N.C. Bd. Of Med. Examiners*, 228 S.E.2d 529 (N.C. Ct. App. 1976), the North Carolina Court of Appeals applied the absolute privilege to affirm dismissal of the plaintiffs' defamation claim. That case did not involve a UDTPA claim. Thus, the court there had no reason to consider the application of the privilege to a UDTPA claim and its statements as to the scope of the privilege are mere dicta. Indeed, NTE cites no case where a North Carolina court has refused to apply the absolute privilege to disparagement allegations framed under any legal theory, whether as a UDTPA claim or otherwise.

NTE's discussion of *Harris* likewise is off the mark. There, the North Carolina Court of Appeals applied the absolute privilege to uphold dismissal of the plaintiff's defamation claim and affirmed dismissal of the plaintiff's UDTPA claim based on "the strong public policy favoring freedom of communication between parties and their attorneys with respect to anticipated or pending litigation"—essentially restating the same public policy rationale underlying the absolute privilege under the rubric of finding the allegations there to constitute neither unfairness nor deception. *Id.*, 355 S.E.2d at 844. As a result, *Harris* firmly supports the application of the absolute privilege to a UDTPA claim, consistent with Duke's arguments.

NTE's UDTPA claim grounded in alleged disparagement thus fails to state a claim because (i) Duke's statements were truthful as a matter of law, (ii) the common law absolute privilege

text of § 455(b)(2) precludes NTE's argument.  It states that a judge must recuse himself when he served "as a lawyer in the matter in controversy, or a lawyer with whom he previously practiced law **served during such association as a lawyer concerning the matter [in controversy]**."  In other words, it is not enough that this matter existed (though it did not) while Judge Bell worked at McGuireWoods—a lawyer at McGuireWoods must have also **served as a lawyer in this matter while Judge Bell worked there**.  As demonstrated above, that did not occur here.

Next, NTE cites two documents it claims show that "McGuireWoods provided legal advice to Duke regarding NTE's suspension of the LGIA *in January 2019*," when Judge Bell was at McGuireWoods.  (Doc. No. 90, at 6).  Neither document supports NTE's claim.  The first is an email chain beginning with one Duke employee asking another Duke employee whether there were any examples of suspended Federal Energy Regulation Commission ("FERC") projects causing delays to state jurisdictional projects.  (DUKE_0403872).  That question was asked because the Public Service Commission of South Carolina ("SC Commission") ordered Duke, on December 19, 2018 (order attached hereto as "**Exhibit A**") to provide an update on the status of its state interconnection projects, the reasons for any delays, and a plan to remedy those delays.  (Ex. A, at 18).  In response to the question posed, Duke employees discussed the project at issue here—the interconnection of the Reidsville Energy Center—identifying it as potentially responsive to the inquiry.  (DUKE_0403871).  On the last email in the chain, a Duke employee carbon copied ("cc") a McGuireWoods attorney.  (DUKE_0403871).

While NTE asserts that the email chain is evidence that "McGuireWoods provided legal advice to Duke regarding NTE's suspension of the LGIA," that is false.  (Doc. No. 90, at 6).  The email chain clearly was not about NTE's decision to suspend the LGIA, but the effects that suspension generally had on projects *in South Carolina*.  (DUKE_0403871).  Further, Duke

6

*Servs.*, Inc., No. 5:18-CV-00066, 2020 WL 2311668 at *3 (W.D. Va. May 8, 2020) (citing *Reese v. United States*, No. 1:12-cr-337, 2017 WL 3016822, at *7 (M.D.N.C. July 14, 2017)) (finding that knowledge held by a senior executive was not "unique" when that knowledge was also held by other employees of the company). If the party seeking the deposition of a corporate executive is unable to provide sufficient evidence to show the executive has "unique or special knowledge" of the facts at issue, then the deposition request must be denied as unduly burdensome and unwarranted. *See Performance Sales & Mktg. LLC*, 2012 WL 4061680 at *4, *10.

In *Performance Sales & Mktg. LLC*, this Court faced a similar dispute in which a large corporation, Lowe's Companies ("Lowe's"), sought relief from a magistrate's order permitting the depositions of its apex officers, including its CEO. *Id.* at *1. Pursuant to Rule 72(a), Lowe's filed an Objection to the Magistrate Judge's Decision with this Court seeking the order be set aside entirely. *Id.* Upon review, this Court found that the deposition requests were "abusive," "unduly burdensome," and "unwarranted" because plaintiffs failed to provide any evidence the executives had unique and personal knowledge of the facts at issue. *Id.* at *10. Accordingly, this Court sustained the objection to the magistrate judge's order "for clear error" and estopped plaintiffs from deposing Lowe's apex officers. *Id.*

Similarly, in *RLI Ins. Co.*, the defendants sought to depose the plaintiff-company's President and Chief Operating Officer ("COO") about the company's business decision to stop selling immigration bonds. 2020 WL 2311668 at *3. The plaintiff-company moved for a protective order on the grounds that the apex doctrine shielded the COO from being deposed, primarily because he did not possess "unique or special knowledge" of facts at issue in the case. *Id.* In response, defendants "failed to point to any piece of discovery" to support its assertion that the executive had unique personal knowledge of the issues in the case. *Id.* Accordingly, the

the opposing party unable "to explore and challenge the basis of the . . . calculations," *AVX Corp. v. Cabot Corp.*, 252 F.R.D. 70, 79 (D. Mass. 2008), such as a when a disclosure arising late in the discovery period makes it "impossible . . . to rebut . . . such calculation without additional extensive discovery." *Ervco, Inc. v. Texaco Ref. & Mktg., Inc.*, No. CV 04-0452-PHX-ROS, 2007 WL 9724100, at *2 (D. Ariz. June 15, 2007); *see also NW Pipe Co.*, 2012 WL 137585, at *2 (disclosure not harmless where its timing "deprived [defendant] of the opportunity to conduct discovery to investigate and evaluate plaintiff's new computation of damages").

Here, allowing NTE to use its untimely supplemental damages calculation would be *extremely* prejudicial to Duke because Duke has not, and will not, have the opportunity to investigate the basis for NTE's new alleged damages. NTE disclosed a brand-new damages calculation ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ a mere six days before discovery closed and provided scant supporting documents (at Duke's insistence) nine days after the same deadline. Further, these documents do not cure the prejudice; they are inadequate, and worse, inaccurate. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Notably, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, information that has apparently been in NTE's possession throughout this litigation and with which it could have supplemented its initial disclosures at any time. But more importantly, because those documents were produced *after* the close of fact discovery and *after* expert reports concerning damages were exchanged, Duke has not, and will not, been unable to conduct *any* discovery into NTE's new damages theory—discovery that any party would undoubtedly conduct when confronted with over ▮▮▮▮▮▮▮▮▮ in damages exposure.

11

## IV. Caselaw Supports this Motion

District courts in North Carolina have consistently held that confidential financial and business information may be appropriately sealed. *See Jones v. Lowe's Cos.*, 402 F. Supp. 3d 266, 291-292 (W.D.N.C. 2019) (keeping portions of deposition testimony under seal which discussed corporate business strategies and financial data); *SMD Software, Inc. v. EMove, Inc.*, No. 5:08-cv- 403-FL, 2013 WL 1091054, at *2 (E.D.N.C. Mar. 15, 2013) (maintaining seal on "confidential financial and business information which, if made public, could harm the parties' business interests"); *see also Silicon Knights, Inc. v. Epic Games, Inc.*, No. 5:07-cv-275, 2008 WL 4933967, at *2 (E.D.N.C. Nov. 14, 2008) (granting motions to seal where parties demonstrated "that the documents and the transcript in question contain confidential and proprietary commercial information, including trade secrets and other information relating to the parties' networks and software, information which is of utmost importance to the parties but not generally available to the public").

Importantly, Duke does not propose that the entire Answer be sealed and proposes instead a limited set of redactions that protect DEC's confidential and proprietary information without unduly burdening the public's right of access to court documents. Courts routinely approve of such limited sealing when necessary to protect confidential business information. *See, e.g., Glob. Bioprotect LLC v. Viaclean Techs., LLC*, No. 1:20-cv-553, 2021 WL 848710, at *7 (M.D.N.C. Mar. 5, 2021) (granting motion to seal where "redactions are needed to protect legitimate interests in the preservation of sensitive business figures and commercial information" (internal quotation marks omitted); *U.S. Tobacco Coop., Inc. v. Certain Underwriters at Lloyd's*, No. 5:19- cv-430-BO, 2020 WL 5984053, at *3 (E.D.N.C. Oct. 8, 2020) ("The parties' business

5

lawsuit. Upon termination of the litigation and with the Court's permission, the parties will retrieve all copies of the sealed materials from the Court's files.

## IV. Caselaw Supports this Motion

District courts in North Carolina have consistently held that confidential financial and business information may be appropriately sealed. *See Jones v. Lowe's Cos.*, 402 F. Supp. 3d 266, 291-292 (W.D.N.C. 2019) (keeping portions of deposition testimony under seal which discussed corporate business strategies and financial data); *SMD Software, Inc. v. EMove, Inc.*, No. 5:08-cv- 403-FL, 2013 WL 1091054, at *2 (E.D.N.C. Mar. 15, 2013) (maintaining seal on "confidential financial and business information which, if made public, could harm the parties' business interests"); *see also Silicon Knights, Inc. v. Epic Games, Inc.*, No. 5:07-cv-275, 2008 WL 4933967, at *2 (E.D.N.C. Nov. 14, 2008) (granting motions to seal where parties demonstrated "that the documents and the transcript in question contain confidential and proprietary commercial information, including trade secrets and other information relating to the parties' networks and software, information which is of utmost importance to the parties but not generally available to the public").

Importantly, Duke does not propose that the entire Reply be sealed and proposes a single redaction that protects NTE's confidential and proprietary information without unduly burdening the public's right of access to court documents. Courts routinely approve of such limited sealing when necessary to protect confidential business information. *See, e.g., Glob. Bioprotect LLC v. Viaclean Techs., LLC*, No. 1:20-cv-553, 2021 WL 848710, at *7 (M.D.N.C. Mar. 5, 2021) (granting motion to seal where "redactions are needed to protect legitimate interests in the preservation of sensitive business figures and commercial information" (internal quotation marks omitted); *U.S. Tobacco Coop., Inc. v. Certain Underwriters at Lloyd's*, No. 5:19- cv-430-BO,

The material to be filed under seal consists of (1) Duke's Response to NTE's Motion to Compel, which contains information and quotations from privileged documents, and (2) the underlying exhibits attached to the Response. Duke's Response quotes extensively and describes in detail the documents underlying this dispute, which have all been withheld from discovery, in whole or in part, because they contain confidential information protected by the attorney-client privilege.

## II. Sealing is Necessary and No Alternative to Sealing Exists

The redacted information in the Response and the documents attached thereto are not publicly available. Further, Duke would be harmed by the public disclosure of the contents of those documents because they relate to attorney-client privileged communications, confidential business decisions, and/or reveal the substance of confidential business dealings. Specifically, public disclosure of that information could damage Duke's business relationships and/or reveal sensitive corporate information that is protected by the well-established attorney-client privilege.

## III. The Unredacted Reply Must Remain under Seal for the Duration of this Suit

Because of the highly sensitive nature of the information contained in the documents referenced in the Response, the material should be maintained under seal for the duration of the lawsuit. Upon termination of the litigation and with the Court's permission, the parties will retrieve all copies of the sealed materials from the Court's files.

## IV. Case Law Supports this Motion

District courts in North Carolina have consistently held that confidential financial and business information may be appropriately sealed. *See* Jones, 402 F. Supp. 3d at 291-292 (keeping portions of deposition testimony under seal which discussed corporate business strategies and financial data); *SMD Software, Inc. v. EMove, Inc.*, No. 5:08-cv- 403-FL, 2013

**III.    NTE's "common law" unfair competition claim fails as a matter of law.**

NTE's common law unfair competition claim fails for the same reasons that its federal antitrust and UDTPA claims fail.  Federal courts applying North Carolina law, when faced with lawsuits under both federal antitrust law and state unfair competition law, have required the plaintiff to plead "additional facts that are unique to their state claims" for those claims to survive a motion to dismiss where the related federal antitrust claims fail.  *See R. J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp.2d 362, 395–96 (M.D.N.C. 2002) (dismissing common law unfair competition claim where "Plaintiffs do not allege any facts that suggest that Defendant's conduct is unlawful beyond the conduct that is the basis for their failed federal [antitrust] claims") (citations omitted)).  Here, paragraphs 111 and 112 of the First Amended Counterclaim make clear that NTE's common law unfair competition claim is just a rehash of its flawed antitrust UDTPA claims.  Recasting those allegations as a common law unfair competition claim does nothing to make the allegations any more viable legally.

Moreover, the available case law does not support a common law unfair competition claim where a statutory UDTPA claim fails.  Faced with the obvious parallels between the two causes of action, courts have found that the common law claim sweeps no more broadly than the UDTPA.  *See generally Marshall v. Miller*, 276 S.E.2d 397, 400 (1981) (discussing the history of the UDTPA statute and that it was "needed because common law remedies had proved often ineffective"); *see also BellSouth Corp. v. White Directory Publishers, Inc.*, 42 F. Supp.2d 598, 599 (M.D.N.C. 1999) (granting summary judgment for defendant on UDTPA and common law unfair competition claims, noting that the standard to recover under the two "is not appreciably different"); *Holley v. Coggin Pontiac, Inc.*, 259 S.E.2d 1, 9 (1979) ("The North Carolina unfair and deceptive trade practice legislation, even though modeled after a federal statute, is itself a
24

### A. Rule 37(c) Provides for the Preclusion of Evidence That Was Required To Be, But Was Not, Appropriately Disclosed or Supplemented Under Rule 26.

Rule 26(a) imposes on parties an obligation to disclose "a computation of each category of damages claimed," and support that disclosure with "documents or other evidentiary material." Fed. R. Civ. P. 26(a)(1)(A)(iii). Although a precise computation may not always be possible until the disclosing party has obtained some discovery, "the disclosing party still has the responsibility to provide each category of required disclosures based on the information it has at the time." *US Bank Nat. Ass'n v. PHL Variable Ins. Co.*, 2013 WL 5495542, at *3 (S.D.N.Y. Oct. 3, 2013); *see also* Fed. R. Civ. P. 26(a)(1)(E) ("A party is not excused from making its disclosures because it has not fully investigated the case."). Further, Rule 26(e) requires a party to supplement its Rule 26(a) disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." *Id.* 26(e).

In turn, "Rule 37(c)(1) gives teeth," *Ace Am. Ins. Co. v. McDonald's Corp.*, No. GLR–11–3150, 2012 WL 2523883, at *2 (D. Md. June 28, 2012) (quoting *Tokai Corp. v. Easton Enterps.*, 632 F.3d 1358, 1365 (Fed. Cir. 2011)), to these requirements by providing that, if a party fails to disclose or supplement "as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The commentary to Rule 37 describes this procedure as an "automatic" or "self-executing sanction." *Id.*, cmt to 1993 amendment. The party facing Rule 37(c) sanctions bears the burden of proving that its non-compliance was substantially justified or harmless. *See S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003). An untimely disclosure is not harmless if its timing deprives the opposing party "of the opportunity to conduct discovery to