**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:19-CV-00515-KDB-DSC**

| | |
|---|---|
| **DUKE ENERGY CAROLINAS, LLC,** | ) |
| | ) |
| Plaintiff/Counter-Defendant**,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **NTE CAROLINAS II, LLC, et al.,** | ) |
| | ) |
| Defendants/Counterclaimants**,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **DUKE ENERGY PROGRESS, LLC, and** | ) |
| **DUKE ENERGY CORPORATION,** | ) |
| | ) |
| Counter-Defendants. | ) |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) |

### ORDER ON MOTION FOR SUMMARY JUDGMENT

This is an action involving antitrust, unfair competition and breach of contract claims among competitors in the market to sell wholesale electricity, none of whom is entitled as a matter of law to succeed in their competitive efforts. Indeed, it has long been emphasized that the antitrust and unfair competition laws at issue stand not as a means to choose market winners and losers, but rather only as guardrails to protect the fairness of the process. Here, it appears to the Court that the NTE Defendants / Counterclaimants want to use these laws not as the shield they are intended to be but as a sword to ensure their own success where the market hasn't fully rewarded their labor.

NTE repeatedly assails the Duke Plaintiff and Counterdefendants as nefarious companies, but it is not for the Court to determine if Duke should receive a corporate citizenship award. Even accepting that Duke has aggressively sought to maintain its leading market position to NTE's

detriment, the sole question before the Court is whether it has done so unlawfully. For the reasons described below, the Court finds Duke has not engaged in unlawful anticompetitive conduct and is entitled to summary judgment with respect to NTE's counterclaims under the Sherman Act and North Carolina's unfair competition law.

However, with respect to the parties' competing claims for breach of contract under the parties' Large Generator Interconnection Agreement ("LGIA"), the Court finds that neither party is entitled to summary judgment, and it will be up to the jury to decide if the LGIA has been breached, unless the parties' settle their dispute prior to trial.[1]

## I.       LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)); *see United States, f/u/b Modern Mosaic, LTD v. Turner Construction Co.*, *et al.*, 946 F.3d 201, 206 (4th Cir. 2019). A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A fact is material if it might affect the outcome of the suit under the governing law." *Vannoy v. Federal Reserve Bank of Richmond*, 827 F.3d 296, 300 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions, or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317,

---

[1] As ordered below, the parties are directed to again mediate their claims prior to trial in light of this Order.

2

323 (1986); *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003)**.** "The burden on the moving party may be discharged by 'showing' ... an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial," *Id*. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id*. at 324.

In determining if summary judgment is appropriate, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing] credibility determinations." *Variety Stores,* 888 F.3d at 659 (internal quotation marks omitted) (quoting *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017)); *see Modern Mosaic* at *2. "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)).

However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Also, the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Id*. If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id*. at 249-50.

3

In the end, the question posed by a summary judgment motion is whether the evidence as applied to the governing legal rules "is so one-sided that one party must prevail as a matter of law." *Id*. at 252.

## II.     FACTS AND PROCEDURAL HISTORY

The parties have filed a voluminous record in this matter reflecting the expansive scope of their discovery efforts. The Court cannot (and need not) recite all of the facts that the parties contend are applicable to the pending motion. Rather, the Court will attempt to "summarize" the relevant facts below with additional facts discussed as necessary in its legal analysis.

### A.     The Parties and the Relevant Market

Counterclaim Defendant Duke Energy Corporation, a large energy holding company, provides electricity and natural gas to millions of customers in several states, including North and South Carolina. It is the parent company of Plaintiff Duke Energy Carolinas, LLC and Counterclaim Defendant Duke Energy Progress, LLC, which provide energy products and services in the Carolinas. The principal place of business of all these "Duke" entities (which will collectively be referred to as "Duke" unless more specificity is required) is Charlotte, North Carolina.

Duke sells electric power directly to residential and commercial "retail" customers and to "wholesale" customers – primarily municipalities – which operate their own distribution lines. Unlike in its retail business, where it is a public utility monopoly regulated by a state public utilities commission,[2] in its wholesale business Duke competes against companies which independently produce and/or sell wholesale power. The market for  wholesale power is regulated by the Federal

---

[2] The rates that Duke charges to North Carolina and South Carolina retail customers are regulated by the North Carolina Utilities Commission ("NCUC") and the South Carolina Public Service Commission ("SCPSC").

Energy Regulatory Commission (FERC), which has exclusive authority over "'the transmission of electric energy in interstate commerce' and 'the sale of electric energy at wholesale in interstate commerce.'" *New York v. FERC*, 535 U.S. 1, 6-7 (2002) (quoting 16 U.S.C. § 824(b)).

Duke operates approximately 70 power plants in the Carolinas region. As of 2014, Duke served the "vast majority of available customers" and "approximately 90% of the available load [in] NC and SC." *See* Doc. No. 214-35 at DUKE_0088890–91. Similarly, NTE's expert Dr. John Morris testified that Duke's share in the relevant market has exceeded 90% since 2012. *See* Doc. No. 214- 4 at ¶ 71. Duke does not challenge the extent of its market share (although it does argue that market share has limited relevance in this market as discussed below). Also, FERC has recognized since at least 2008 that Duke has "market power" for purposes of determining how Duke must price the wholesale power it sells (i.e., "cost based" pricing). *See* Doc. No. 214-11 at 128:16–129:3; 137:6–23; Doc. No. 214-18 at 99:22–100:16.

Defendants and Counterclaimants NTE Carolinas II, LLC, NTE Carolinas II Holdings, LLC, NTE Energy, LLC, NTE Southeast Electric Co., LLC, NTE Energy Services Co., LLC, and Castillo Investment Holdings II, LLC (together, "NTE") are collectively an independent power producer ("IPP") that develops and operates power generation facilities that sell wholesale power to municipalities and electric cooperatives. NTE has its principal place of business in St. Augustine, Florida. While NTE builds power plants, it does not also build transmission networks to connect its plants to the interstate transmission grid. Therefore, to deliver the power it sells, NTE needs to connect to utilities like Duke that own transmission networks. By regulation, FERC requires that Duke allow NTE to connect to Duke's network, and FERC sets the terms of the interconnection by requiring that Duke and IPPs enter into a FERC approved standard contract, the pro forma LGIA.

### B. The Kings Mountain Energy Center

In 2014, NTE began developing the Kings Mountain Energy Center ("Kings Mountain"), a combined-cycle natural gas plant. *See* Doc. No. 214-14 at 339:4–13. Duke and NTE entered into a standard LGIA to interconnect Kings Mountain with Duke's transmission network. The project was successful. Nine former Duke customers agreed to buy power from the Kings Mountain plant, and it began operations in April 2018. There is no claim in this action related to Kings Mountain; however, NTE alleges that because of NTE's success at Kings Mountain, Duke became worried about its ability to retain its wholesale customers and began to target NTE as a competitor. Duke's internal documents contain vivid rhetoric regarding its intent to compete against NTE, including that Duke planned to go to "battle" to "stop the NTE train" and "ruin NTE's plans." *See* Doc. No. 214-63, Doc. No. 215-1, Doc. No. 215-6.

### C. The Reidsville Plant and its LGIA

In 2016, NTE announced plans to build a second plant in the Carolinas, the Reidsville Energy Center ("Reidsville"), which was designed to be a 450 MW power generation facility. NTE signed contracts with three smaller customers who agreed to buy power from the plant, including a former Duke customer. Doc. No. 214-57; Doc. Nos. 214-74, 214-75. Also, the NCUC granted Reidsville a Certificate of Public Convenience and Necessity for the plant. Doc. No. 214-52 at NTE_00436341. As with Kings Mountain, Duke and NTE entered into a standard LGIA for Reidsville in 2017. In that LGIA, NTE agreed to pay Duke approximately $59 million for connection costs. *See* Doc. No. 204-1 at Appendix A, B. The LGIA included a Payment Schedule, which specified the dates and amounts of NTE's scheduled payments. *Id.* Appendix B. The LGIA also contained provisions providing for authorization in advance of Duke spending money on the project. *Id.* at §§ 5.5, 5.6, 11.5.

Duke's municipal power customers typically sign long term contracts spanning many years so only a few contracts may come up for renewal in a given year. As of 2016, the largest North Carolina city served by Duke that might be served by Reidsville and had the ability to evaluate alternative energy options was Fayetteville, North Carolina. Fayetteville, which has a peak load of approximately 500 MW, was a prize municipal wholesale electricity customer. The contract Duke had with the Fayetteville Public Works Commission ("FPWC") was up for renewal in 2024, with an option for Fayetteville to "opt out" several years before then. Both Duke and NTE, which said that it needed FPWC as an anchor customer for Reidsville, focused heavily on keeping/getting FPWC's business.

### D. Competition for the City of Fayetteville's Business

Since the 2012 merger between Duke and Progress Energy, FPWC had received its full energy and capacity requirements from Duke under an amended Power Supply and Coordination Agreement ("PSCA") at a FERC-approved formula rate. The 2012 Power Supply Agreement had a term of July 1, 2012 through June 30, 2032, but Fayetteville retained the right to terminate the PSCA as of June 1, 2024, upon notice to Duke by June 30, 2017, a date which was extended several times to June 30, 2019, December 31, 2019 and June 30, 2020.[3]

Although it did not conduct a formal RFP process, FPWC went through an extensive evaluation process prior to deciding whether to terminate/renew its PSCA with Duke. This process included engaging GDS & Associates ("GDS"), an outside consultant. After evaluating six pricing

---

[3] NTE contends that these extensions, which Duke admits were given so that it and FPWC would have more time to reach a deal on a renewal of the contract before a RFP process might be undertaken, are evidence of wrongful conduct. However, as discussed below, FPWC was not required to go through a formal RFP process and more importantly FPWC went through an extensive process to evaluate numerous competing bids – including NTE's – before choosing one of Duke's proposals.

7

proposals from five viable potential suppliers, including Duke and NTE, FPWC decided on April 24, 2019 to negotiate contract amendments with Duke rather than pursue an RFP to select a different supplier. *See* Doc. No. 204-10 (GDS 30(b)(6) Deposition) at 167-170; Doc. No. 204-39 at 177-178. In GDS' view, three of the proposals (including both DEP proposals) reflected a lower cost than NTE's. *See* Doc. No. 204-10 at 137-138, 164-165; Doc. No. 204-11 at FPWC_0004977, 82. Further, NTE's proposal was found to have more "risks" than the other proposals. *Id.* at 146-165, Doc. No. 204-11 at FPWC_0004981-82. For example, Duke offered a diverse system and native load status unlike NTE, which planned to primarily serve FPWC using a single plant and a single fuel source (natural gas) that is subject to market-price risks. This diversity was sought after by wholesale customers like FPWC. *See* Doc. No. 204-39 at 237, 252-253.

On May 24, 2019, FPWC and Duke executed a letter of intent containing the material financial terms of the amendments to their existing PSCA. *See* Doc. No. 204-9. Under the agreed terms, FPWC would receive a lower price from Duke for the same power services going forward through a number of "discounts" or credits, including: (1) a $2.50 kw-month discount to its capacity price for the period from 2021 to mid-2024 and (2) a billing demand credit of on average 190 MW for FPWC's Butler Warner facility (an older, less efficient facility). *Id.* Duke also extended (by six months) an existing Power Purchase Agreement ("PPA") for capacity and energy from FPWC's Butler Warner facility and entered into a PPA for Butler Warner capacity and energy to take effect once the prior contract expired. *Id.* FPWC and Duke executed the final revised PSCA on November 13 and 25, 2019.

Duke's wholesale power contracts must be filed with FERC, who may decide not to accept the filing if it finds that Duke's wholesale rates are not "just and reasonable" based on its costs of providing service, *i.e.*, a "cost-of-service" formula rate. See 16 U.S.C. §824. Duke filed the new

8

FPWC PSCA with FERC on November 27, 2019. *See* Doc. No. 226-1. After NTE failed to complain, seek to intervene or protest the filed rate (as it could have done by December 18, 2019 or later),[4,5] FERC formally accepted the rate for filing effective February 1, 2020. *Id*. FPWC's CEO and corporate representative both testified that none of the alleged Duke conduct that NTE complains of had any effect on FPWC's decision to choose Duke. *See* Doc. No. 204-39 at 269-271; Doc. No. 204-8 at 190-197.

### E. Duke's Termination of the LGIA, OASIS Posting and NCUC Intervention

The LGIA permits NTE to suspend work on the Reidsville interconnection project "at any time." Doc. No. 204-1 at § 5.16. NTE exercised this right on May 15, 2019, allegedly because it had "additional flexibility with scheduling." Doc. No. 215-15 at DUKE_0017112; Doc. No. 214-14 at 453-454. Although Duke (and perhaps the timing of the suspension shortly following FPWC's initial decision to select Duke's proposal) suggests otherwise, NTE states that the suspension was not based on any information about FWPC, which NTE continued to pursue. Doc. No. 216-5; Doc. No. 217-3.

In 2017 and early 2018, NTE made payments totaling $1.6 million on the Reidsville LGIA and Duke twice agreed to delay the payment schedule dates and/or reduce the remaining interim

---

[4] NTE could have challenged Duke's FPWC rate with FERC in at least three ways. First, NTE had the right to file a complaint against Duke if it believed that Duke's contract with FPWC violated a FERC statute, rule, order, or other law. *See* 18 C.F.R. § 385.206. Second, NTE could have intervened in Duke's request to file the rate, *see* 18 C.F.R. § 385.214, and, third, NTE could have protested the rate. *See* 18 C.F.R. § 385.211. And, if NTE was not satisfied with FERC's ruling on its challenge then it could seek rehearing or court review. *See* 16 U.S.C. 8251. FERC has the authority to not allow the rate to be filed or to set a just and reasonable rate if it finds that Duke's rate was unjust, unreasonable, unduly discriminatory, or preferential. *See* 16 U.S.C. § 824.

[5] NTE alleges that Duke failed to fully disclose its FPWC discounts and credits to FERC. While this appears to be incorrect on the merits, *see* Doc. No. 204-48 at Exhibit B, NTE ought not, having failed to take any action to challenge Duke's FPWC contract with FERC, be permitted to assert in this action its inadequate disclosure arguments (which if true could have been remedied before FERC accepted – or perhaps might not have accepted – the filed FPWC rate).

payments due. As amended, the LGIA scheduled payments of $2.5 million to be due on March 1, 2019, and $4.5 million on May 1, 2019. *See* Doc. No. 204-2. Neither payment was made on those dates; however, Duke admits that it failed to timely invoice NTE and, in fact, specifically instructed NTE to wait to pay until it received invoices (which had not previously been sent during the parties' relationship even though contemplated by the LGIA). In addition to these scheduled payments, Duke contends that the LGIA obligated NTE to pay Duke certain costs upon suspension of the project. *See* Doc. No. 204-1 at §5.16. Duke claims that the amount of these suspension costs is approximately $6.3 million. *See* Doc. No. 204-53 at Exhibit Y. All of these allegedly due payments were ultimately invoiced to NTE in the Summer of 2019, but no payments were made. *See* Doc. No. 204-53 at Exhibit B, E. NTE has also failed to pay any of the disputed payments into escrow, which Duke claims is required under Article 12.3 of the LGIA.

The parties' efforts to resolve their payment dispute through communications among counsel and then during an in person meeting involving the parties was unsuccessful.[6] On September 6, 2019, Duke terminated the LGIA under Article 17.1.2. NTE contends that Duke was not entitled to terminate the LGIA without FERC's authorization, *see* Doc. No. 204-1 at § 2.3, and that Duke did so only to harm NTE because "terminating" the LGIA allowed Duke to claim that the Reidsville project was "canceled" or "terminated" rather than "suspended." Beyond the filing of this action which NTE alleges to be "a sham lawsuit," NTE complains that Duke used the termination of the LGIA to list the Reidsville interconnection project as "canceled" on its publicly available Open Access Same-Time Information System ("OASIS").

_____

[6] NTE initially argued that Duke's alleged refusal to settle the parties' dispute over the amount of payments due under the LGIA was part of its wrongful conduct, but at oral argument NTE abandoned that claim, conceding that Duke's settlement demands could not be the basis of a claim for exclusionary antitrust conduct or an unfair trade practice. *See* Doc. No. 228 at 86 ("I can't say that someone refusing to settle a lawsuit is a wrong. I'm not suggesting that.").

*See* Doc. No. 217-14. Further, On December 6, 2019, Duke filed a Petition with the NCUC to intervene in NTE's efforts to extend its Certificate of Public Convenience and Necessity for Reidsville, citing, in part, the termination of the LGIA. However, despite Duke's intervention, NTE was ultimately successful in renewing its certificate in August 2021. Doc. 123 at p. 44. Further, NTE has not identified any customer or potential customer who saw the OASIS posting. Doc. No. 204-4 at 154; Doc. No. 204-41 at 262.

On November 8, 2019, NTE filed, pursuant to Sections 206 and 306 of the FPA, a petition for a declaratory order requesting that FERC declare, *inter alia*, that a transmission provider such as Duke seeking to terminate an LGIA (1) must receive FERC approval to do so, and (2) may not announce any such termination until it has been approved by FERC. *See* Doc. No. 125-3. On May 21, 2020, FERC granted in part NTE's petition, holding that "a transmission provider seeking to terminate a conforming LGIA over an interconnection customer's objection must receive Commission approval to do so," and that "a transmission provider may not announce the termination of a conforming LGIA over an interconnection customer's objection (either on its OASIS or in reports to the Commission) unless and until the Commission has approved the termination." *NTE Carolinas II, LLC & NTE Energy, LLC*, 171 FERC ¶ 61, 128 P14 (2020); Doc. No. 125-4. However, FERC explained that it granted NTE's petition in part to "remove uncertainty regarding the termination provisions in the Commission's *pro forma* LGIA," and the order stated that FERC was not addressing the merits of the parties' breach-of-contract claims. *Id*. at P 27. Following FERC's ruling, Duke returned the Reidsville project to its public "queue" project list in the same position as before September 6, 2019 and changed the project status on OASIS from "canceled" to "suspended." Doc. 204-26 at 196-197. The

Reidsville plant currently remains accurately listed as a "suspended" project on OASIS and Duke's queue list.

### F. The Lawsuit

Duke Energy Carolinas, LLC, the entity that entered into the Reidsville LGIA with NTE, filed this lawsuit in North Carolina Superior Court on September 6, 2019, the same day that Duke sent NTE a letter terminating the LGIA. In its Complaint, Duke asserted substantive claims for breach of contract, unjust enrichment, negligent misrepresentation and unfair trade practices. Doc. No. 1-1. On October 8, 2019, Defendants removed the action to this Court, Doc. No. 1, and there has been no dispute over the Court's jurisdiction or the venue of this action after removal. On December 11, 2019, NTE filed their Answer and Counterclaims denying Duke's claims and asserting claims of monopolization and attempted monopolization under Section 2 of the Sherman Act, statutory and common law unfair trade practices and unfair competition under North Carolina law and breach of contract. Doc. No. 13. The parties have since amended their claims and counterclaims, with each side now also seeking a declaratory judgment in their favor regarding their respective claims. *See* Doc. Nos. 114, 125. Before the Court is Duke's Motion for Summary Judgment on all of NTE's amended counterclaims and Duke's breach of contract and account stated claims. Doc. No. 191. The parties have extensively briefed the motion and the Court heard oral argument on the motion on June 13, 2022. The motion is now ripe to be decided.

### III. DISCUSSION

### A. NTE's Sherman § 2 Antitrust Counterclaims

NTE alleges that Duke has violated Section 2 of the Sherman Act, 15 U.S.C. § 2, both as a monopolist and an attempted monopolist. The statute provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person ... to

monopolize any part of the trade" is guilty of an offense and subject to penalties. It has been long established that a violation of Section 2 consists of two elements: (1) possession of monopoly power and (2) "... maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 480 (1992) (citing *United States v. Grinnell Corp.,* 384 U.S. 563, 571, (1966)). Duke has moved for SJ on both monopolization claims on the grounds that as a matter of law Duke lacks "monopoly power" and the conduct alleged to be exclusionary was not unlawful. Each issue is addressed below.

    1. Monopoly Power

"Monopoly power under § 2 requires ... something greater than market power under § 1," *Eastman Kodak,* 504 U.S. at 481; thus, the concept of "monopoly" is distinct from "monopoly power." Monopoly power has been broadly defined as the ability "to control prices or exclude competition." *Grinnell,* 384 U.S. at 571; *see also United States v. E.I. du Pont de Nemours and Co.,* 351 U.S. 377 (1956). However, courts often do not limit their analysis to direct evidence of monopoly pricing or the exclusion of competitors. Rather, some courts hold that because such evidence is "only rarely available, courts more typically examine market structure in search of circumstantial evidence of monopoly power." *United States v. Microsoft,* 253 F.3d 34, 51 (D.C. Cir. 2001). Under this approach, monopoly power may be found from a firm's possession of a dominant share of a relevant market that is protected by entry barriers. *Id.; see Rebel Oil Co. v. Atl. Richfield Co.,* 51 F.3d 1421, 1434 (9th Cir. 1995). "Entry barriers" are factors such as long lead times, high capital costs and regulatory requirements that prevent new rivals from timely responding to an increase in price above the competitive level. *Microsoft,* 253 F.3d at 51; *S. Pac. Communications Co. v. AT & T,* 740 F.2d 980, 1001–02 (D.C.Cir.1984).

As explained in *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 99 F. Supp. 3d 610, 624–26 (D. Md. 2015):

> a party may establish monopoly power "either through 'direct evidence of supracompetitive prices and restricted output' or by inference 'from the structure and composition of the relevant market.' " *Intellectual Ventures,* 2013 WL 6682981, at *4 (quoting *Broadcom Corp. v. Qualcomm Inc.,* 501 F.3d 297, 307 (3d Cir.2007)). For example, control of seventy percent or more of the relevant market is circumstantial evidence of monopoly power. *See Kolon Indus.,* 637 F.3d at 450–51. But, it is not sufficient evidence in and of itself: A plaintiff using market share to establish monopoly power also "must show that new competitors face high market barriers to entry and that current competitors lack the ability to expand their output to challenge a monopolist's high prices." *Image Tech. Servs., Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1208 (9th Cir.1997). These "[b]arriers to entry 'must be capable of constraining the normal operation of the market to the extent that the problem is unlikely to be self-correcting.' " *Id.* (quoting *Rebel Oil Co. v. Atl. Richfield Co.,* 51 F.3d 1421, 1439 (9th Cir.1995)).

Further, "antitrust analysis must sensitively recognize and reflect the distinctive economic and legal setting of the regulated industry to which it applies." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 411–12 (2004) ("Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue. Part of that attention to economic context is an awareness of the significance of regulation.").

Predictably, the parties urge the Court to focus on the type of evidence which each believes favors their position. In particular, they disagree on how the Court should view Duke's indisputably high share of the market, which is at or approaching 90%. While nominally agreeing that market share is "relevant" to whether a jury could find that a company has monopoly power, Duke asks the Court to in practical effect ignore market share.[7] Instead, Duke wants the Court to

---

[7] Duke asks the Court to find that historical market share is irrelevant because its current market share is based on numerous contracts entered into long ago, which it argues are not relevant to the current market for new or renewing customers. Duke is plainly wrong on this point. It is universally true that market share is a snapshot in time reflecting transactions that occurred in the past and cannot predict the future with certainty. Thus, all market shares are by nature "historical," and

focus only on what it argues is Duke's inability to either control prices or exclude competitors, including FERC's regulations that limit Duke's pricing power and require it to allow competitors to use its transmission network. On the other hand, while NTE acknowledges that monopoly power ultimately relates to the control of prices and exclusion of competitors, it argues that the Court need not address those issues directly because a jury can (and in their view should) simply "infer" monopoly power from Duke's high market share.

The Court finds that both sides miss the mark. Market share is important evidence in determining if a company has monopoly power, but it is not solely dispositive, through "inference" or otherwise. Also, contrary to Duke's arguments, the presence of regulation does not mean that a utility company can never be found to have monopoly power. Instead, the jury must consider market share together with the realities of the structure of the relevant market to decide if Duke has or is likely to achieve monopoly power.

Here, while FERC limits the maximum price that Duke can charge a customer, that does not necessarily mean that Duke cannot control prices above a "competitive" price. Indeed, Duke concedes that it was only after it faced significant competition from NTE that it offered to lower its price at FPWC. *See Gordon v. Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005) (market power is "the ability to raise prices above those that would otherwise prevail in a competitive market"). In the absence of viable competition, Duke can and will set its price at "as much as the market will bear,"[8] which in the market for the sale of wholesale electricity is the upper limit of

---

blanket acceptance of Duke's argument would always preclude the consideration of market share, in contravention of decades of established authority.

[8] Even a clear monopolist has an upper limit on its prices, which is "as much as the market will bear." *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979) ("A pristine monopolist, we have held, may charge as high a rate as the market will bear.").

what FERC will allow. And, as reflected in the price of Duke's renewed contract at FPWC, the difference between the maximum price FERC would allow (at least FPWC's then existing rate) and a "competitive" price can be substantial. Therefore, a jury could find that Duke can "control prices" in the relevant market.

Similarly, with respect to the exclusion of competitors, FERC's regulatory role does not preclude the possibility that a jury could find that the structure of the market can lead to the "exclusion" of competitors. Again, while Duke narrowly focuses on the FERC regulations that require the sharing of transmission lines (for fair compensation), the jury must look at market exclusion through a broader lens. Specifically, the jury must consider whether there are "barriers to entry" in the market that would allow Duke time to control prices before a new rival could emerge. *See Microsoft,* 253 F.3d at 51. First, the structure of the wholesale electricity market includes the fact that there are only a limited number of customers up for renewal each year so the opportunities for new entrants are constrained. Further, entering the market to generate and sell wholesale electricity takes considerable time and resources, including obtaining financing and regulatory approvals and then actually building a power plant. Therefore, although the necessity of a large investment to compete in a market cannot, standing alone, lead to a finding of monopoly power against the market's dominant firm, a jury could find that Duke has or could readily achieve monopoly power based on the hurdles to market entry, considered together with the other evidence discussed above.

However, just as the jury could find that Duke has monopoly power it could also reject that conclusion. Duke argues that the proper way to look at its alleged monopoly power in the relevant market is to use the analysis described by the court in *Ticketmaster Corp. v. Tickets.Com, Inc.*, No. CV99-7654-HLH(VBKX), 2003 WL 21397701, at *5–6 (C.D. Cal. Mar. 7, 2003), aff'd, 127 F.

App'x 346 (9th Cir. 2005). In that case, the court found that Ticketmaster, by far the dominant company in the ticket industry at the time, did not have monopoly power (that is, the ability to control prices or exclude competition) in an industry marked by long term exclusive contracts and bidding for those contracts. In making its ruling, the court stated:

> Size alone or heavy market share alone does not make one a monopolist (or in danger of becoming one). To qualify as a monopolist or have a dangerous likelihood of becoming one, one must have either the power to control prices or to exclude competition. In fact, the power to exclude competition is almost a necessity to be able to charge prices above competitive levels. (*Grinnell Corp.,* '66 384 U.S. 563, 16 L.Ed.2d 778; *Image Technical Services* 9Cir'97 125 F3d 1195.) There must be evidence of the ability to control prices or exclude competitors. (*Oahu Gas Servs. Inc.* 9Cir'88 838 F.2d 360.)

> The evidence here establishes that these conditions do not exist because of the bidding nature of the competition, in which [Plaintiff] TX is fully able to join, that the venues have the bargaining power to prevent being taken advantage of, that prices cannot be unilaterally raised because of the long term contracts controlling the prices, and that there are no meaningful barriers to entry by TX if it can convince venues that it can provide better service or a better price.

> The evidence is uncontradicted that virtually all long term contracts are awarded after some form of bidding competition. The bidding may be more or less formal, but every time a contract is up for renewal (about 20% or more of the total per year), TX as well as TM have the opportunity to compete for the contract. TX has competed in all situations. The fact that TM has won the majority of these competitions shows only that the contracting venue believes that TM offers the better deal, not only in terms of price, but also in terms of reliability and ability to do a competent job. However, TM's victories are not unanimous. TX has prevailed in head to head competition in a number of regions, and most impressively in major league baseball. The bidding nature of the competition is a powerful deterrent against the existence of monopoly power so long as there are competitors to bid so as to give the customer an alternative, and TX has been a major alternative.

The *Ticketmaster* analysis could be persuasive in thinking about the "structure" of the relevant market in this case. Duke clearly has the dominant market share in the market; however, the structure of the market may suggest limitations on Duke's ability to wield "monopoly power" in the form of price controls and exclusion of competitors. With respect to prices, as in *Ticketmaster*, there is almost always competitive bidding for major customers, the municipalities

17

themselves have negotiating power and – going beyond the *Ticketmaster* facts – Duke's prices are regulated by FERC. Thus, Duke argues that, all things considered, its opportunity to charge "above market" monopolistic prices is low.[9] Also, with respect to exclusion of competitors, beyond the FERC regulations supporting the entry of competitors into the market, Duke points to evidence that there were five companies bidding for the FPWC business, more than ten companies bidding for another recent customer, and NTE has itself been successful against Duke in the past at both Kings Mountain and Reidsville. Thus, according to Duke, the market does not reflect the exclusion of competitors.[10]

In sum, a reasonable jury could find either that Duke has "monopoly power" or it does not. There is evidence from which a jury could find that Duke has a durably high market share together with barriers to entry; however, the structure of the market also suggests potential limitations on Duke's ability to control prices and exclude competitors. Thus, the Court will not grant summary judgment for Duke on the issue of monopoly power, the first element of liability under Section 2 of the Sherman Act.

2. Anti-Competitive / Exclusionary Conduct

However, the Court reaches a different conclusion on the second element of a claim for monopolization under § 2, which is proof of improper exclusionary conduct harming competition. That is, a claimant must allege not only the possession of monopoly power in the relevant market,

---

[9] NTE argues that Duke intends to make up any discounts used to keep customers away from NTE by raising prices with other customers, but there is no reason to believe the same limitations to raising prices would not equally apply to all cities of similar sizes.

[10] NTE argues that this evidence regarding the number of bidders is undercut by evidence that Duke had only lost business to NTE in the relevant recent past. *See* Doc. No. 214-16 at 47. (Duke executive testifying that Duke lost only one customer to a competitor other than NTE). Therefore, NTE raises questions as to the actual practical viability of Duke's other "competitors" in the market.

but also the unlawful use of that power. *See Eastman Kodak Co.,* 504 U.S. at 481–83 (To run afoul of Section 2, a defendant must be guilty of illegal conduct "to foreclose competition, gain a competitive advantage, or to destroy a competitor."). As explained by the Supreme Court, "to safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct.*" *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407, 124 S. Ct. 872, 879, 157 L. Ed. 2d 823 (2004) (emphasis in original); *see also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition or 'purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.'") (internal citations omitted).

Thus, NTE must prove that Duke unlawfully "use[d] [its] monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor,'" or acquired or maintained that power willfully, and not "from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* (quoting *United States v. Griffith,* 334 U.S. 100, 107 (1948)). Also, some behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist. As noted in *LePage's, Inc. v. 3M,* 324 F.3d 141, 151–52 (3d Cir.2003), "a monopolist is not free to take certain actions that a company in a competitive (or even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior."

"Whether any particular act of a monopolist is exclusionary, rather than merely a form of vigorous competition, can be difficult to discern: the means of illicit exclusion, like the means of legitimate competition, are myriad." *Microsoft*, 253 F.3d at 58–59. Still, to be condemned as

exclusionary, a monopolist's act must have an "anticompetitive effect." That is, it must harm the competitive process and thereby harm consumers. In contrast, harm to one or more competitors will not suffice. *Id*. "The [Sherman Act] directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 458 (1993).

Here, NTE alleges the following "exclusionary" acts which it contends, considered collectively and individually, support its antitrust claims: 1) terminating the LGIA without FERC approval (refusal to deal / denial of an essential facility); 2) obtaining a new contract with FPWC through predatory pricing and gaining approval for the price from FERC without full disclosure of the discount given to FPWC (predatory pricing / fraud on FERC); 3) Filing this lawsuit, which NTE alleges to be a "sham lawsuit"; 4) Duke's OASIS posting that the Reidsville project had been "canceled" (defamation); and 5) Duke's intervention against NTE's request to renew its Certificate of Public Convenience and Necessity with the NCUC.

With respect to this conduct, NTE first argues that even if none of the alleged exclusionary acts are unlawful by themselves that the acts taken together can be sufficient to support a Sherman Act violation. According to NTE, "a plaintiff can allege a series of actions that when taken together make out antitrust liability even though some of the individual actions, when viewed independently, are not all actionable," quoting *In re Intuniv Antitrust Litig*., 496 F. Supp. 3d 639, 680 (D. Mass. 2020). The Court disagrees, at least with respect to the circumstance where none of the alleged exclusionary conduct is unlawful. Adding up several instances of lawful conduct cannot total unlawful conduct. In simple mathematical terms, $0 + 0 = 0$. *See Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.,* 486 F. App'x 186, 191 (2d Cir. 2012) ("Because these alleged instances of misconduct are not independently anticompetitive, we conclude that they are not

cumulatively anti-competitive either."); *City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928 (2d Cir. 1981); *Arminak & Assocs. v. Saint-Gobain Calmar, Inc.*, 789 F. Supp. 2d 1201, 1211 (C.D. Cal. 2011). Indeed, the case cited by NTE says that plaintiffs "must plead at least one instance of conduct that is not protected from antitrust scrutiny." *Intuniv*, 496 F. Supp. 3d at 680. Therefore, if none of the actions NTE alleges to be improper are actionable, NTE cannot maintain its Sherman Act claims. Thus, each alleged exclusionary act is discussed below.

### a. Termination of the LGIA / Refusal to Deal / Denial of Essential Facility

NTE alleges that Duke unlawfully terminated the LGIA and denied NTE's access to Duke's transmissions grid, which NTE alleges to be "an essential facility." Duke seeks summary judgment on this claim of "exclusionary" conduct on the grounds that: (1) FERC regulates access to Duke's network and controls the scope of the LGIA; therefore, NTE cannot pursue an antitrust claim under the authority of *Verizon v. Trinko* and (2) NTE's refusal-to-deal claim does not meet the prerequisites for such claims. The Court finds Duke's arguments have merit.

In making its first argument, Duke relies on *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004). In *Trinko*, a local telephone service customer of AT&T filed a complaint against Verizon for its alleged denial of interconnection services to rivals with the purpose of  limiting their entry into the market for telephone services. *Id.* at 407. The Supreme Court held that Verizon's alleged refusal-to-deal could not be pursued as an antitrust claim, reasoning that it could not find anticompetitive malice in the circumstances of Verizon being statutorily compelled to share its services (typically there is no requirement even for a monopolist to do business with a rival). "We conclude that Verizon's alleged insufficient assistance in the provision of service to rivals is not a recognized antitrust claim under this Court's existing refusal-to-deal precedents." *Id.* at 410.

Also, and even more directly relevant here, the Supreme Court concluded that "essential facility claims should … be denied where a state or federal agency has effective power to compel sharing and to regulate its scope and terms." *Id.* at 410-11. It explained:

> As we have noted, "careful account must be taken of the pervasive federal and state regulation characteristic of the industry."
> …
> One factor of particular importance is the existence of a regulatory structure designed to deter and remedy anticompetitive harm. Where such a structure exists, the additional benefit to competition provided by antitrust enforcement will tend to be small, and it will be less plausible that the antitrust laws contemplate such additional scrutiny.

*Id.* at 411–12 (citations omitted). Applying *Trinko* to this action, FERC's regulatory scheme compels Duke to share its transmission systems with competitors; therefore, according to Duke, *Trinko* bars NTE's antitrust claim based on a failure to deal or inadequate compliance with FERC regulations.

NTE argues that *Trinko* does not apply because *Trinko* was a "pure failure-to-deal case" whereas "NTE's claims are not so limited," although it offers little explanation for this argument beyond its conclusion. More substantively, NTE asserts that *Otter Tail Power Co. v. U.S.*, 410 U.S. 366 (1973) rather than *Trinko* applies because "Duke denied NTE access to essential facilities to impair NTE's competitive efforts." In *Otter Tail*, the Supreme Court held that the plaintiff was not immune from antitrust regulation because it was in the business of providing power transmission over its network to certain customers, "and refused to provide the same service to certain other customers." *Id.* at 370-371, 377-378. The Court reasoned that when commercial relationships are entered into voluntarily, "courts must be hesitant to conclude that Congress intended to override the fundamental national policies embodied in the antitrust laws." *Id.* at 374. NTE claims that *Otter Tail* and not *Trinko* applies because it alleges that Duke continues to offer

interconnection services to less threatening rivals while refusing to offer those services to NTE based on NTE's competitive success.

The Court finds that *Trinko* rather than *Otter Tail* is more applicable to this case for at least two reasons: (1) *Trinko* was not a "pure" failure-to-deal case, and (2) the authority of the Federal Power Commission in *Otter Tail* was more limited than FERC's current authority. NTE asserts that its allegations that Duke's intent in terminating the LGIA was to impair NTE's competitive efforts distinguishes the case from *Trinko*. However, the plaintiff in *Trinko* made almost identical allegations. In *Trinko*, the plaintiff's amended complaint "alleged that Verizon had filled rivals' orders on a discriminatory basis as part of an anticompetitive scheme to discourage customers from becoming or remaining customers of competitive LEC's…." *Trinko*, 540 U.S. 398 at 404. Accordingly, NTE's argument that *Trinko* does not apply because it was a "pure" failure-to-deal case is unpersuasive.

Second, *Otter Tail* is not applicable because the authority of the Federal Power Commission was more limited than FERC's current authority. In *Otter Tail*, the essential thrust of the authority of the Federal Power Commission was to encourage voluntary interconnections. *Otter Tail*, 410 U.S. at 366. It was against this backdrop that the Court concluded that "courts should be hesitant to override the fundamental national policies embodied in the antitrust laws." *Id.* at 374. In *Otter Tail*, the Federal Power Commission lacked the authority to correct the Plaintiff's monopolistic practices. *Id.* at 366. Here, NTE concedes that FERC requires Duke to share its transmission networks with competitors. Doc. No. 125. Accordingly, *Otter Tail* does not apply because its holding was predicated on the limited authority of the Federal Power Commission to

correct anticompetitive practices. Because FERC has the authority to correct Duke's sharing of its transmission network, *Trinko* rather than *Otter Tail* applies.[11]

Lastly, Duke argues that even if *Trinko* does not apply, NTE's refusal-to-deal claim does not meet the prerequisites for such claims. Generally, the Sherman Act "does not restrict the long-recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *United States v. Colgate & Co*., 250 U.S. 300, 307 (1919). However, "the right to refuse to deal with other firms does not mean that the right is unqualified." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp*., 472 U.S. 585, 601 (1985). *Aspen Skiing* is "the leading case for § 2 liability based on refusal to cooperate with a rival," which "is at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 408-09. In *Aspen Skiing*, the Court found two factors significant in determining whether a refusal-to-deal was exclusionary: (1) "the unilateral termination of a voluntary course of dealing," and (2) the refusal to deal at retail price. *Id.* at 879-880.

The factors identified in *Aspen Skiing* help case-by-case assessments of whether a refusal-to-deal is anticompetitive, but no factor is always decisive by itself. *Viamedia, Inc. v. Comcast Co*., 951 F.3d 429, 4657 (7th Cir. 2020). Unlike in *Aspen Skiing*, NTE does not allege a unilateral termination of a voluntary course of dealing nor does it have evidence that Duke refused to provide its interconnection services at a "retail" price. Indeed, the "price" for the interconnection was set in the LGIA and approved by FERC. Also, Duke terminated the LGIA after NTE stopped making

---

[11] And FERC has broad enforcement power, including authority to impose civil penalties of over $1 million per violation per day (*see* 16 U.S.C. § 825o-1(b); *Civil Monetary Penalty Inflation Adjustments*, 178 FERC ¶ 61,008, at P 8 (2022)). Therefore, "Congress has given FERC the tools to police anticompetitive conduct in the market for transmission capacity." *Breiding v. Eversource Energy*, 939 F.3d 47, 55 (1st Cir. 2019).

payments under the contract (although the amount owed is of course disputed). Therefore, Duke's motion for summary judgment as to whether its termination of the LGIA was exclusionary should independently be granted under both *Trinko* and *Aspen Skiing*.[12]

### b. Predatory Pricing at FPWC / Fraud on FERC

NTE's second claim of exclusionary conduct is that Duke obtained its renewed contract with FPWC through predatory pricing and Duke's alleged failure to disclose information to FERC about the discounts it gave to FPWC.[13] Again, Duke offers several grounds for summary judgment on this conduct. First, Duke seeks summary judgment based on the "filed rate" doctrine, which generally prohibits claims challenging a "filed" rate approved by a regulator, and, as a second argument, asserts that its price at FPWC was not "predatory" as a matter of law because the price was above its marginal / incremental cost and it had no reasonable probability of recouping any alleged losses incurred by below cost pricing.

### 1. The Filed Rate Doctrine

Duke contends that the filed rate doctrine bars NTE's claims related to the FPWC contract. The filed rate doctrine provides that antitrust law "may not be used to invalidate a filed rate nor to assume a rate would be charged other than the rate adopted by the federal agency in question." *Wah Chang v. Duke Energy Trading & Mktg., LLC*, 507 F.3d 1222, 1225 (9th Cir. 2007); *Keogh*

---

[12] Moreover, since May 2020, the status of the Reidsville LGIA has properly been referenced as "suspended," and NTE has failed to establish that the termination of the LGIA caused any harm to the competitive process because there is no evidence that any potential customer failed to do business with NTE because of the termination (or even considered the termination in deciding whether to choose NTE as its power provider). *See* Doc. No. 204-4 at 154; Doc. No. 204-8 at 190-192, 194-196; Doc. No. 204-40 at 270-271; Doc. No. 204-41 at 262.

[13] To the extent that NTE asserts that Duke's alleged failure to disclose information in violation of FERC regulations is an independent exclusionary act, it is barred under *Trinko* for the same reasons discussed above. Indeed, as noted, NTE could have timely challenged Duke's price at FPWC (including any alleged failure to disclose information) but failed to do so. *See* 18 C.F.R. § 385.206, 16 U.S.C. § 825e, 18 C.F.R. § 3856.211(a)(1).

*v. Chicago & N.W. Ry. Co.*, 260 U.S. 156 (1922). The doctrine bars any interference with the rate setting authority of an administrative agency or a claim that a rate is incorrect, including rates approved by FERC. There is no dispute that Duke's contract price at FPWC is a "filed rate" subject to FERC's regulation. Therefore, if the filed rate doctrine applies to this action, it bars NTE's claims related to Duke's rate at FPWC.

In response, NTE contends that the filed rate doctrine (also known as the *Keough* doctrine) does not apply to suits involving competitors. Except in an unpublished decision, *Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp. of Delaware,* 998 F.2d 1009 (4th Cir. 1993), the Fourth Circuit has not addressed this issue, which has been decided differently among the circuit courts that have considered the question. *Compare Arsberry v. Illinois*, 244 F.3d 558, 562 (7th Cir. 2001) (Posner, J.) ("A customer or competitor … cannot ask the court … to invalidate or modify the tariff" in an antitrust suit); *Pinney Dock & Transp. Co. v. Penn Central Corp*., 838 F.2d 1445, 1457 (6th Cir. 1988) *with Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99 F.3d 937, 945 (9th Cir. 1996); *Groton v. Connecticut Light & Power Co.,* 662 F.2d 921 (2d Cir.1981); *Essential Communications Systems, Inc. v. American Telephone & Telegraph Co.,* 610 F.2d 1114 (3d Cir.1979) (refusing to apply the *Keogh* doctrine because the FCC tariff was not intended to protect competitors). Closer to this Court in the District of South Carolina, the court in *Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp. of Delaware*, 805 F. Supp. 1277, 1295–96 (D.S.C. 1992), aff'd, 998 F.2d 1009 (4th Cir. 1993), applied the doctrine to an antitrust dispute involving trucking companies, citing *Georgia v. Pennsylvania R.R. Co.,* 324 U.S. 439 (1945), a case in which the Supreme Court applied the *Keogh* doctrine in a case in which Georgia was both a customer and a competitor.

26

One of the principal reasons for the doctrine is to preserve the primacy/exclusivity of the regulator's power to set rates. *Arsberry*, 244 F.3d at 562–63 ("The filed-rate doctrine, which is based both on historical antipathy to rate setting by courts, deemed a task they are inherently unsuited to perform competently, and on a policy of forbidding price discrimination by public utilities and common carriers, forbids a court to revise a public utility's or (as here) common carrier's filed tariff."). Indeed, filed rates (including those regulated by FERC) "must not only protect against overcharging captive customers but must also keep in mind the economic costs of delivery of the service." *Pinney*, 838 F.2d at 1457 ("the ICC is the sole source of the rights not only of shippers, but of the entire public, including competitors. Plaintiffs here had a right under the ICC to complain to the Commission. We should not easily infer that the Reed-Bulwinkle amendments were not intended to extend to competitor's suits.").[14]

If a primary purpose of the filed rate doctrine is not to undermine the regulator's authority to set rates and manage the rate setting process, any undermining of that authority, whether it comes from a customer or a competitor, would adversely impact the agency's rate setting authority. However, the court in *Cost Mgmt. Servs.* makes a thorough argument against applying the doctrine to competitors on the grounds that 1) the *Keough* reasoning has been criticized and has limited application to competitors, 2) *Keough* has received at best lukewarm support from the Supreme Court and 3) "exemptions from the antitrust laws are strictly construed and strongly

---

[14] The Court also notes that FERC regulations specifically permit protests, complaints and interventions by competitors. If FERC can disallow a rate as too low, then it is clearly protecting competitors because customers with long term set rates are unlikely to be hurt by rates that are "too low." Also, while NTE points out that FERC cannot award "money damages," it can overturn a rate, which should have the effect of supporting the competitive process by allowing NTE and other competitors to compete for business against a lawful rate.

Case 3:19-cv-00515-KDB-DSC   Document 229   Filed 06/24/22   Page 27 of 49

disfavored." *See Cost Mgmt. Servs,* 99 F.3d at 945-47; *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 415, 421 (1986).

In sum, there is a sharp split of authority on this issue, which no court in the Fourth Circuit has directly addressed in thirty years. As discussed below, the Court finds that NTE's predatory pricing allegations fail on the merits, and a reasonable jury could not find based on the record before the Court that Duke offered FPWC a predatory price. Therefore, in the absence of guidance from our Court of Appeals or the need to resolve this murky question, the Court will not reach out to decide the issue and simply assume, without deciding, that the filed rate doctrine does not bar NTE's predatory pricing claim.

2.      Predatory Pricing

Even if the "filed rate" doctrine does not apply, NTE cannot prevail on the merits of its predatory pricing claim. A plaintiff seeking to establish competitive injury resulting from a rival's predatory pricing must prove that: (1) the rival's prices are below an appropriate measure of its rival's costs, and (2) the rival had a dangerous probability of recouping its investment in below-cost prices. *Brooke,* 509 U.S. at 222-24. "The choice of a cost-based standard for evaluating claims of predatory pricing is a question of law to be decided by the trial judge." *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co*., 708 F.2d 1081, 1111 (7th Cir. 1983).[15]

_____

[15] NTE argues that the determination of which cost measure is the proper standard to apply for predatory pricing is a "jury" question. However, NTE has offered no support for that proposition and the Court has not found any. In fact, multiple circuits explicitly hold the contrary. In *MCI Communications,* the Seventh Circuit noted there "is no support.... for the proposition that a jury may simply choose the cost-based standard it feels is most appropriate." *Id*. at 1112. Consequently, in *MCI* the court reversed the trial judge and held that the choice of a cost-based standard for evaluating claims of predatory pricing is a question of law to be decided by the court. *Id*. at 1111. Similarly, in *Northeastern Telephone Co. v. AT&T*, 651 F.2d 76 (2d Cir. 1981), the Second Circuit held that the cost standard used to determine whether a monopolist's prices were predatory was a "legal question." 651 F.2d at 87. In sum, there is no support for the proposition that the

Antitrust law begins with the premise that all firms, even dominant firms, are permitted to compete aggressively and that hard competition is a desired outcome rather than an evil. Thus, prices above the relevant measure of cost become an absolute safe harbor. *See Phillip E. Areeda (late) & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ("*Areeda*")* ¶735. (4th and 5th Editions 2015-2021); *Brooke*, 509 U.S. at 226-227 ("[T]he mechanism by which a firm engages in predatory pricing—lowering prices—is the same mechanism by which a firm stimulates competition; because 'cutting prices' in order to increase business often is the very essence of competition ...[;] mistaken inferences ... are especially costly, because they chill the very conduct the antitrust laws are designed to protect. It would be ironic indeed if the standards for predatory pricing liability were so low that antitrust suits themselves became a tool for keeping prices high.") (internal citations omitted).

Although in *Brooke* the Supreme Court appeared to clearly discourage condemnation of prices that are not "below some measure of incremental cost," *id.* at 223, the Supreme Court has not articulated a definitive standard under which to measure a defendant's costs. Similarly, the Fourth Circuit has not specified a test other than acknowledging that prices must be below an appropriate measure of  a  defendant's cost to  be predatory (*Liggett  Group,  Inc.  v.  Brown  & Williamson Tobacco Corp.*, 964 F.2d 335, 339 (4th Cir. 1992), affirmed by *Brooke Group Ltd. v. Brown Williamson Tobacco Corp.*, 509 U.S. 209 (1993)).

In discussing what should be the appropriate measure of costs with respect to alleged predatory pricing, it is helpful to first explain some economic definitions:

> The economic costs facing a firm differ in an important respect: some are "fixed"
> and others are "variable."

---

determination of the correct cost measure is a jury question. As such, the Court will address  it as a question of law.

Fixed costs are costs that do not vary with changes in output. They typically include some management expenses, interest on bonded debt, depreciation (to the extent that equipment is not consumed by using it), property taxes, and other irreducible overhead…. In short, it is reasonably accurate to say that fixed costs are costs that would continue even if the firm produced no output at all.

"Variable costs," as the term implies, are costs that vary with changes in output. They typically include items such as materials, fuel, labor directly used to produce the product, indirect labor such as supervisors, clerks, and custodial help, use depreciation, repair and maintenance, and per-unit royalties and license fees. The "average variable cost" is the sum of all variable costs divided by output.

"Marginal cost," or "incremental cost," is the increment to total cost that results from producing an additional increment of output. The usual meaning of marginal cost is "short-run" marginal cost, which is a function solely of variable costs, since fixed costs by definition are costs unaffected by changes in output. Short-run marginal cost usually decreases over low levels of output and increases as production approaches plant capacity.

"Total cost" is the sum of fixed cost and total variable cost. That total divided by output is average cost or average total cost or, to use the layperson's synonym, full cost.

*See* Areeda at ¶735.

Here, NTE has suggested "total average system costs" as the relevant measure of costs and Duke argues that the measure should be "incremental" costs. *See* Doc. No. 204-31 at 130, 134-35; Doc. No. 204-32 at ¶ 86; Doc. No. 224 at 6. While the Court need not specifically define the appropriate measure of costs among "incremental," "marginal," and "average variable costs," the overwhelming weight of authority favors a measurement that does not include the fixed, non-incremental costs included in NTE's proposed measurement. Circuit courts outside the Fourth Circuit have routinely held that the appropriate measure of costs is either "average variable costs" or "marginal costs." *See, e.g., Tri State Rubbish v. Waste Management*, 998 F.2d 1073, 1080 (1st Cir. 1993) (variable costs); *Irvin Indus. v. Goodyear Aerospace Corp.*, 974 F. 2d 241, 245 (2d Cir. 1992) (marginal costs); *Clean Water Opportunities, Inc. v. Williamette Valley*, 759 Fed.Appx. 244,

246-247 (5th Cir. 2019) (Pricing is anticompetitive when it is below a defendant's true marginal cost but because true marginal cost may be difficult to calculate, Fifth Circuit courts may use average variable cost); *William Inglis & Sons Baking Co., v. ITT Cont'l Baking Co., Inc.*, 668 F.2d 1014, 1035-1036 (9th Cir. 1981) (there is a presumption that if a defendant's price is above its average variable cost, it is not predatory); *U.S. Philips Corp. v. Windmere Corp.*, 861 F.2d 695, 703 (Fed. Cir. 1988) (pricing below a defendant's average variable cost is predatory).

Similarly, the leading antitrust treatise argues for a "marginal cost" or "average variable cost" standard of measurement. *See* Areeda at ¶739 ("We generally say that under perfect competition a firm produces at a level such that its price equals marginal cost … [thus] a price above marginal cost—or higher than the competitive price—cannot be condemned as 'predatory' …. Our own position is that no price equal to or exceeding properly defined and reasonably anticipated marginal cost should be deemed unlawful under the antitrust laws."), ¶740 (proposing that average variable cost be used as a surrogate for marginal cost when marginal cost is difficult to calculate).

In contrast, courts and commentators have often rejected fully allocated total system costs as the appropriate measure of costs. In *MCI*, 708 F.2d at 1116–17, the court explained:

> FDC [Fully distributed costs] also fails as an economically relevant measure of cost for antitrust purposes because it relies on historical or embedded costs. For it is current and anticipated cost, rather than historical cost that is relevant to business decisions to enter markets and price products. The business manager makes a decision to enter a new market by comparing anticipated additional revenues (at a particular price) with anticipated additional costs. If the expected revenues cover *all* the costs caused by the new product, then a rational business manager has sound business reasons to enter the new market. The historical costs associated with the plant already in place are essentially irrelevant to this decision since those costs are "sunk" and unavoidable and are unaffected by the new production decision.
>
> …

31

FDC is, at best, a rough indicator of an appropriate rate *ceiling* for regulatory purposes and should not be used as a measure of the minimum price permissible in a competitive market. … A standard making predatory pricing illegal and subject to treble damages must be carefully structured to fit the needs of the Sherman Act and its encouragement of competition on the merits. (citation omitted). When a price floor is set substantially *above* marginal or incremental cost a price "umbrella" is created which allows less efficient rivals to remain in the market sheltered from full price competition. A fully distributed price floor may thus misallocate resources and force consumers to pay more for less production than competition would dictate.

*See also Northeastern Telephone Co. v. AT & T,* 651 F.2d 76 (2d Cir.1981), *cert. denied,* 455 U.S. 943 (1982) (rejecting fully distributed cost and adopting marginal cost as the test for predation).

More specifically, the Areeda treatise explains as follows regarding the error in using fully distributed costs as the measure of predatory pricing:

Looking at its sales as a whole, a firm must recover long-run incremental costs in order to be profitable. But any individual sale that is sufficient to recover short-run costs is profitable, and may be much more profitable than not making the sale at all. Consider this simplified example: a firm pays a building rent of $1,000 per month, which does not vary with output or revenue and is thus a long-run cost. This rental is its only fixed cost. The firm produces widgets at a short-run marginal cost of $3 and sells approximately 1,000 a month, which is its capacity. Thus a price of $4 is needed to cover both short-run and long-run (overhead) costs. But suppose a buyer offers $3.50 each for 500 widgets and will not pay a penny more, and the seller can produce them out of existing capacity. In this case producing the widgets covers all short-run marginal costs and generates a $250 contribution toward the rental of the building—not enough, to be sure, to pay the rent, but far better than no contribution at all. Taking the offer increases the firm's profits (or reduces its losses) without regard to the impact of the sale on rivals; it is clearly not predatory.

Areeda at ¶739a, ¶741. *See also Superior Prod. P'ship v. Gordon Auto Body Parts Co*., 784 F.3d 311 (6th Cir. 2015) (evidence tended to show that while defendant's prices were below its average total costs, they were higher than its average variable costs, thus excluding its predatory pricing claim).

Using a proper measure of incremental, marginal or variable costs, a reasonable jury could not find that Duke engaged in predatory pricing at FPWC. First, as discussed above, NTE has not

offered evidence or analysis of Duke's variable costs related to FPWC, instead arguing that Duke is liable for predatory pricing for pricing below its average system costs.[16]  Second, NTE has acknowledged that Duke's price at FPWC contributed $90 million towards fixed costs above variable or marginal costs. *See* Doc. No. 204-30 at 77. Because it is undisputed that Duke's FPWC price contributed significantly to fixed costs above its variable costs, Duke's price is not predatory under the antitrust laws.   Therefore, NTE cannot establish that Duke committed unlawful exclusionary conduct by its competitive pricing at FPWC.[17]

### c.  Sham Litigation

NTE's third allegation of exclusionary conduct is Duke's filing of this lawsuit, which NTE alleges to be "sham litigation." The parties have spent relatively little time on this claim - with good reason. To the extent this claim is not barred by *Trinko* as part of NTE's claim for unlawful termination of the LGIA, this action cannot be considered to be sham litigation. Under the *Noerr Pennington* doctrine, those who petition government for redress – including through civil lawsuits – are immune from antitrust liability, unless "the litigation is objectively baseless" (i.e., a "sham"). *See Professional Real Estate Investors, Inc. ("PREI") v. Columbia Pictures Indus., Inc*., 508 U.S.

---

[16] On March 22, 2022, a month after the expert report deadline, and on the eve of his deposition, Dr. Morris submitted a new analysis purporting to reallocate Duke's common fixed costs as part of his total average cost analysis. *See* Doc. Nos. 214-22. 224-8. However, this belated evidence does not address whether any of those costs are incremental. Further, the Court declines to consider any portion of Dr. Morris' analysis that is untimely. *See* Doc. No. 187 (declining to consider untimely damages contentions).

[17] NTE has also failed to establish the second prong of predatory pricing, which is that there is a "dangerous probability" that Duke would be able to "recoup" its losses from unlawful below cost pricing after it excluded its competitors. "If market circumstances or deficiencies in proof would bar a reasonable jury from finding that the scheme alleged would likely result in sustained supracompetitive pricing, the plaintiff's case has failed." *Brooke Grp.,* 509 U.S. at 226. Here, Duke not only had a long term contract with FPWC that prevented Duke from raising prices during the contract, but also there is no evidence that FPWC would be able to charge improperly increased prices to  other customers (where there would be similar bidding, negotiation and regulation) to make up for "losses" at FPWC.

49, 51, 56 (1993); *Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27*, 728 F.3d 354, 362 (4th Cir. 2013). A lawsuit is objectively baseless if "no reasonable litigant could realistically expect success on the merits."

As discussed further below, Duke's claims in this action are not baseless. Indeed, NTE has not even moved for summary judgment on Duke's claims, thereby conceding that a reasonable jury could find in either party's favor (as NTE explicitly argues in response to Duke's motion for summary judgment). Further, rather than being surprised by Duke's claims, NTE expected Duke to sue for the LGIA payments Duke claims to be owed. *See* Doc. No. 204-17 at NTE_00103057 (NTE Managing Partner Green writing in May 2019 that if NTE received an invoice under the Payment Schedule and refused to pay it, then NTE would be "in default," Duke would terminate the LGIA, and NTE would be sued). Therefore, this suit is not "sham litigation," and Duke is entitled to judgment as a matter of law on NTE's allegation that this lawsuit is itself an unlawful exclusionary act.[18]

### d. Defamation

NTE's fourth allegation of exclusionary conduct is its allegation that Duke defamed NTE, specifically that Duke put an allegedly false statement in its OASIS database saying that the Reidsville project had been canceled. However, NTE cannot establish that this statement, even if materially false,[19] constitutes defamation because there is no evidence that the statement was in

---

[18] At oral argument, NTE somewhat changed the thrust of its sham litigation argument, asserting that Duke's initial inclusion of two of NTE's executives as individual defendants was wrongful even if the lawsuit itself was not a "sham." However, both of the individual defendants were voluntarily dismissed on October 31, 2019, only approximately three weeks after NTE removed the action to this Court, and there is no evidence that the brief inclusion of these defendants caused any competitive harm.

[19] The falsity of this statement is disputed by Duke, which argues that during the time the project was listed as canceled in OASIS, the LGIA had in fact been canceled by Duke (even though that status was later changed back to suspended in May 2020).

fact heard or read by a third party. "In order to recover for defamation, a plaintiff generally must show that the defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person." *Lippard v. Holleman*, 271 N.C. App. 401, 439-40, 844 S.E.2d 591, 617 (2020) (citing *Desmond v. News & Observer Publ. Co.*, 241 N.C. App. 10, 16, 772 S.E.2d 128, 135 (2015)). But here, NTE has failed to produce any admissible evidence that any customer or potential customer saw the OASIS posting. *See* Doc. No. 204-4 at 154, Doc. No. 204-41 at 262. Therefore, there was no defamatory publication under North Carolina law and, more directly relevant to NTE's claim of exclusionary antitrust conduct, there could not have been any harm to the competitive process in the absence of the statement being seen in the relevant market. Indeed, there is no evidence that a potential customer would view "termination," "cancelation" and "indefinite suspension" of the LGIA as materially different. *See* Doc. No. 204-19 at NTE_00264339 (NTE managing partner Green writing in an email "when our prospective customers … read 'suspension', they will walk away with the thought that the REC project is 'terminated.'"). Accordingly, NTE's defamation claim related to the OASIS posting also fails as an exclusionary act.

### e. Duke's Intervention Against NTE's Renewal of its NCUC Certificate of Necessity

Finally, NTE alleges that Duke's intervention in opposition to NTE's petition to renew its Certificate of Public Convenience and Necessity for Reidsville was an unlawful exclusionary act. This argument is meritless. Even if Duke was not entitled as a matter of right to oppose NTE's petition (which it almost certainly was under the *Noerr Pennington* doctrine), there is no dispute that NTE was ultimately successful in renewing its certificate in August 2021. Doc. 123 at p. 44. Duke's intervention against NTE at the NCUC thus had no effect on the competitive process and cannot be an unlawful exclusionary antitrust act as a matter of law.

35

In summary, each alleged instance of Duke's exclusionary antitrust conduct fails as a matter of law. Even though it did not achieve the success it hoped for, NTE was not the victim of an unlawful competitive process. FERC protected and supported NTE's efforts to build the Reidsville plant, requiring Duke to enter into the LGIA. Also, NTE had a full opportunity to sell power to FPWC; however, their offer was found lacking, not by Duke but by FPWC. Indeed, NTE had several means to challenge Duke's FPWC rate with FERC but chose not to do so. As to Duke's termination of LGIA (after NTE's unilateral decision to suspend the Reidsville project and cease payments to Duke), NTE opposed the termination at FERC, which held in NTE's favor, thereby returning the status of the project to "suspended" before any customer or potential customer was affected. Again, antitrust law should not be employed to pick winners and losers and the Court declines to do so here. Such judgments must be left to the market, whose conclusions may indeed be painful to some competitors, as it apparently has been to NTE. Simply put, NTE has not presented sufficient evidence of unlawful anticompetitive conduct to warrant a trial on its Sherman Act claims. Accordingly, the Court will grant Duke's motion for summary judgment on those claims.

**B.**     **NTE'S UDTPA and Unfair Competition Claim**

NTE asserts claims against Duke for both statutory and common law unfair competition under North Carolina law. The North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1, et seq., makes unlawful unfair or deceptive acts or practices in or affecting commerce that proximately injures a plaintiff. *See Shepard v. Bonita Vista Properties*, L.P., 191 N.C. App. 614, 664 S.E.2d 388, 395 (N.C. Ct. App. 2008). Consequently, NTE's UDTPA claims require that "(1) [Duke] committed an unfair or deceptive trade practice, (2) the act or practice in question was in or affecting commerce; and (3) the act or practice

proximately caused injury to the plaintiff." *Elsayed v. Family Fare* LLC, 2020 WL 4586788 at

*14 (M.D.N.C. Aug. 10, 2020).

An act is deceptive "if it has a tendency or capacity to deceive" and unfair if it "offends

established public policy" or is "immoral, unethical, oppressive, unscrupulous, or substantially

injurious to consumers." *Marshall v. Miller*, 302 N.C. 539, 276 S.E.2d 397, 403 (N.C. 1981).

Unfair competition "encompass[es] any conduct that a court of equity would consider unfair."

*Polo Fashions, Inc. v. Craftex, Inc*., 816 F.2d 145, 148 (4th Cir. 1987). A party is guilty of an

unfair act or practice when it engages in conduct which amounts to an inequitable assertion of its

power or position. *Johnson v. Phx. Mut. Life Ins. Co*., 300 N.C. 247, 264, 266 S.E.2d 610, 622

(1980)

Commerce is defined as "all business activities." N.C. Gen. Stat. § 75-1.1(b). North

Carolina courts have interpreted business activities broadly. *See Bhatti v. Buckland*, 328 N.C. 240,

400 S.E.2d 440, 444 (N.C. 1991). Business activities is defined as "the manner in which businesses

conduct their regular, day-today activities, or affairs, such as the purchase and sale of goods, or

whatever other activities the business regularly engages in and for which it is organized." *Sara Lee

Corp. v. Carter*, 351 N.C. 27, 519 S.E.2d 308, 311 (N.C. 1999).

Similarly, the North Carolina "tort of unfair competition consists of acts or practices by a

competitor which are likely to deceive the consuming public." *Camco Mfg., Inc. v. Jones Stephens

Corp.*, 391 F. Supp. 3d 515, 528 (M.D.N.C. 2019). The "standard for violation of the UDTPA and

common law unfair competition are not appreciably different." *Id.* (citation omitted). "The

gravamen of unfair competition is the protection of a business from misappropriation of its

commercial advantage earned through organization, skill, labor, and money." 488 S.E.2d at 240.

37

With respect to its UDTPA and unfair competition claims, NTE alleges that Duke acted unfairly through the same conduct that it alleges to be unlawful exclusionary acts under the Sherman Act. *See* Doc. No. 228 at 113. (NTE counsel agreeing at oral argument that "yes, [the acts that constitute the unfair and deceptive are the same as with the Sherman Act] - I don't have a different set of facts."). And, in response, Duke asserts both procedural and merits arguments as it did with respect to NTE's Sherman Act claims. Specifically, Duke reprises its argument under the "filed rate" doctrine, argues that NTE's state law claims are preempted by federal law and claims that NTE has not established that any one of the alleged acts is unfair or deceptive as a matter of law.

1. Federal Preemption of State Law

Duke argues NTE's UDTPA and common law unfair competition are preempted by federal law for several reasons including: 1) that the filed rate doctrine bars the state claims; 2) Congress has preempted the field of wholesale energy regulation; and 3) *Buckman* or "conflict" preemption applies. The Court has thoroughly discussed the filed rate doctrine above and will not repeat that discussion here. As with NTE's claims under the Sherman Act, the Court will assume, without deciding, that the filed rate doctrine does not bar NTE's state law claims.

However, Duke's other preemption arguments fare better, at least with respect to much of NTE's alleged unfair trade practices. Duke contends that Congress occupied the field of wholesale electricity regulation with the FPA. Under field preemption, "[i]f Congress evidences an intent to occupy a given field, any state law falling within that field is preempted." *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248 (1984). State law is impliedly preempted by federal law whenever Congress has regulated a particular field so pervasively that there are no gaps within which state law may operate. *See Cavallo v. Star Enter.*, 100 F.3d 1150, 1155 (4th Cir.1996).

In *Cal. ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 849, the 9th Circuit held the Federal Power Act ("FPA") "delegates to [FERC] exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce." *Lockyer* rejected California's attempt to enforce state-law prohibitions on "fraudulent business practices" in the context of wholesale electricity. Further, the court stated, "that remedies for breach and non-performance of FERC approved operating agreements in the interstate wholesale electricity market fall within the exclusive domain of FERC." NTE argues *Lockyer* is distinguishable because the claim in that case directly challenged the reasonableness of FERC-approved wholesale rates. *Id*. at 852. NTE argues that it is not challenging Duke's rates directly in its state claims and therefore can obtain relief without disturbing any FERC-approved rate.

However, the FPA's preemption of the field of wholesale energy regulation is broader than simply rate setting. By its allegations of unfair trade practices, NTE is directly challenging not only the lawfulness of Duke's rates at FPWC (arguing that the filed rate should have been different to prevent the rate from being anticompetitive) but also the lawfulness of Duke's termination of the LGIA as well as Duke's alleged violation of other FERC regulations, including disclosure obligations. To the extent that NTE claims that Duke's FPWC rates should not have been allowed or Duke's conduct violated FERC's regulations then NTE seeks to apply state law to an area in which Congress has given FERC undisputed exclusive authority. Thus, *Lockyer* is directly on point and field preemption bars NTE's first two alleged exclusionary/unfair acts discussed above (unlawful termination of the LGIA and wrongful conduct at FPWC).

Third, Duke argues *Buckman* preemption applies. Under *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), a plaintiff's attempts to use state law to second-guess a defendant's interactions with a federal agency are preempted. In *Buckman*, the plaintiffs claimed

39

that the defendant misled the FDA in its application for approval of a medical device that allegedly harmed them and that, "[h]ad the representations not been made, the FDA would not have approved the devices, and plaintiffs would not have been injured." *Id.* at 344. The Supreme Court held that the plaintiffs' attempt to police the defendant's "dealings with the FDA" was preempted because "the federal statutory scheme amply empowers the FDA to punish and deter fraud against the [agency], and … this authority is used by the [agency] to achieve a somewhat delicate balance of statutory objectives. The balance sought by the [agency] can be skewed by allowing fraud-on-the-FDA claims under state tort law." *Id*. at 347-48.

Again, NTE's response is that its claims are based on "traditional state tort law principles"—which *Buckman* specifically distinguishes, *id*. at 352—and involves an area not exclusively regulated by the federal government. However, as discussed above, much of NTE's claims consist of allegations that Duke violated FPA and FERC regulations. As such, FERC would be the proper place to pursue those allegations, not this Court. Any finding by this Court or a jury that Duke committed a "fraud-on-FERC" would encroach on FERC's authority to regulate entities under its control and are thus preempted under *Buckman*.

2. <u>Duke's Arguments on the Merits of NTE's Alleged Unfair and/or Deceptive Acts</u>

Even if none of NTE's unfair competition claims are preempted by federal law, Duke argues that it is still entitled to summary judgment on NTE's state law claims. The Court agrees, for many of the same reasons that it found that none of NTE's exclusionary acts to be unlawful plus additional reasons discussed below.

With respect to NTE's claims related to Duke's alleged wrongful termination of the LGIA, in the UDTPA context the question becomes whether Duke's "breach of contract, even if intentional, is [] sufficiently unfair or deceptive to sustain an action under [the UDTPA]." *Mitchell*

*v. Linville*, 557 S.E.2d 620, 623 (N.C. Ct. App. 2001). As a matter of law a breach of contract without more culpable conduct cannot support a claim under Section 75-1.1; that is, a claim may not be based on the "existence of an agreement, the terms contained in the agreement, and the interpretation of an agreement." *Broussard v. Meineke*, 155 F.3d at 347. Rather, a plaintiff must show "substantial aggravating circumstances attending the breach." *Id.*; *see also Post v. Avita Drugs*, LLC, No. 17 CVS 798, 2017 WL 4582151, *5 (N.C. Oct. 11, 2017) (aggravating circumstances must "exhibit clear deception" (citations omitted)). An example of an aggravating circumstance is deception "in the formation of the contract." *Bartolomeo v. S.B. Thomas, Inc*., 889 F.2d 530, 535 (4th Cir. 1989). Indeed, a party's "threats to terminate," "efforts to encourage" another to continue contractual performance while "planning to breach," and "refusal to otherwise meet" contractual obligations have been held not to rise to the level of aggravating circumstances. *See Deltacom, Inc. v. Budget Telecom, Inc.*, No. 5:10-cv-38-FL, 2011 WL 2036676, at *4 (E.D.N.C. May 20, 2011).

NTE argues that it has shown a broad campaign of unfair acts intended to interfere with NTE's emergence as a competitor. Specifically, NTE says that Duke knowingly breached the LGIA and did so specifically so it could announce to the public that the Reidsville project had been canceled so as to ruin NTE. However, even assuming that Duke "intentionally" breached the contract, the Court does not find sufficient "aggravating" circumstances where, even though FERC ultimately ruled in favor of NTE on the termination issue, in doing so it suggested that it was "clarifying" the relevant regulations and contractual provisions. A contract and regulations in need of clarification, even to a small extent, cannot be grounds for a finding of the substantial "aggravating" circumstances sufficient to support an unfair trade practice under North Carolina law. Moreover, Duke's conduct in allegedly attempting to collect more than NTE owed and failing

41

to file a termination notice required under the contract clearly goes directly to the contract and the "terms contained in the agreement."

With respect to NTE's predatory pricing claims, to the extent those claims survive preemption they also fail on the merits as non-predatory for the reasons described at length above. Finally, NTE's defamation, sham litigation and wrongful NCUC claims fail on the merits for the same reasons discussed above. There is no evidence of wrongful publication of the alleged defamatory statement in OASIS that the Reidsville project had been "canceled," *See Arnold v. Sharpe*, 296 N.C. 533, 539, 251 S.E.2d 452, 456 (1979) (there is no basis for an action for libel unless there is a publication of the defamatory matter to a person or persons other than the defamed person); *West v. King's Dep't Store*, Inc., 321 N.C. 698, 703, 365 S.E.2d 621, 624 (1988) (to be published, the defamatory material must be "communicated to and understood by a third person."). Further, this action is not a sham litigation that is "objectively baseless." And, finally, as to all of these claims, NTE has not presented evidence from which a jury could find that any of them proximately caused injury to NTE's business.[20] As repeated now several times, NTE has failed to

---

[20] NTE maintains that it has satisfied the proximate cause requirement because the causation standard is low and that it need only prove that Duke's "conduct was a substantial cause of [its injury]" or the injury was the type Duke's "conduct was naturally likely to cause." *See Am. Rockwool, Inc. v. Owens-Corning Fiberglas Corp.*, 640 F. Supp. 1411, 1444–46 (E.D.N.C. 1986); *Ellis v. Smith-Broadhurst*, Inc., 268 S.E.2d 271, 273–74 (N.C. Ct. App. 1980). However, the Court finds NTE's cited cases easily distinguishable. In *Ellis*, the court found that there was some "evidence that [the customer] was influenced by the alleged misrepresentations in their initial rejection of plaintiff's policy and that even after plaintiff attempted to correct the alleged misrepresentations, [the customer] continued to rely upon the comparison made by defendants." 48 N.C. App. 180, 184. And in *Am. Rockwool, Inc.,* there was no question that the customers had knowledge of the defendant's disparagement of plaintiff's product and false statements about its own product even though the customers disclaimed reliance on the information. In contrast, NTE has been unable to identify a single potential customer that would otherwise have purchased electricity from NTE who was aware of the OASIS posting or Duke's intervention in the NCUC proceeding.

produce evidence that any customer, prospective customer or other person or entity failed to do business with NTE because of Duke's alleged unfair or deceptive conduct.

Accordingly, all of NTE's alleged unfair trade practices fail on the merits and Duke is entitled to summary judgment on NTE's state law statutory and common law unfair competition claims.

### C.    The Parties' Breach of Contract Claims

Both parties have asserted claims for breach of the LGIA contract. Duke seeks payment under the agreement for contractual "milestone" payments as well as payments Duke contends it is entitled to receive for costs incurred related to NTE's suspension of the LGIA. According to Duke, the total that NTE owes under the contract exceeds $12 million. Specifically, Duke has filed claims for breach of contract and a separate claim for "account stated" on the grounds that NTE has allegedly acknowledged its debt to Duke.

In turn, NTE claims that Duke has breached the Reidsville LGIA by failing to comply with (1) the provisions of LGIA related to suspension of work and the termination of the agreement; (2) failing to give NTE the actual amount of its costs prior to suspension and demanding that NTE pay an amount in excess of the reasonable and necessary costs incurred by Duke prior to and after suspension; (3) promoting the interests of its wholesale electric power business through false and misleading practices in its Transmission Group; (4) failing to provide NTE reasonable access to Duke's accounts and records pertaining to Duke's performance under the Reidsville LGIA; (6) violating Article 27.1 of the Reidsville LGIA by failing to designate a senior representative to meet with NTE in connection with the dispute resolution process; (7) violating Article 5 of the Reidsville LGIA by spending money on procurement that was neither authorized nor secured by NTE in advance of the commencement of such procurement; (8) violating Article 5 of the Reidsville LGIA

by spending money on construction of the facilities that was neither authorized nor secured by NTE in advance of the commencement of such work; (9) violating Article 24.2 of the Reidsville LGIA by failing to send monthly reports containing the contractually required information; and (10) failing to file a Notice of Termination to record its purported termination of the Reidsville LGIA with FERC pursuant to the FPA and Article 2.3.3 of the Reidsville LGIA.

Duke has moved for summary judgment on both parties' claims. For the reasons discussed below, the Court finds that there are disputed material facts with respect to these claims so Duke is not entitled to summary judgment on either its breach of contract claims or NTE's.

1.  Duke's Breach of Contract and "Account Stated" Claims

The elements of a breach of contract claim are "(1) the existence of a valid contract and (2) breach of the terms of that contract." *Kranik, et al. v. Cape Fear Academy*, No. 7:21-CV-169-D, 2022 WL 2195293, at *16 (E.D.N.C. June 17, 2022), quoting *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000); *see Wells Fargo Ins. Srvs. USA. Inc. v. Link*, 372 N.C. 260, 276, 827 S.E.2d 458, 472 (2019) (per curiam). The parties agree that the Reidsville LGIA is a valid contract (in fact, they are both suing to enforce it); therefore, the question with respect to Duke's claim for breach of contract is whether NTE breached the terms of the LGIA. Although it is undisputed that NTE has not paid the amounts that Duke contends are due under the LGIA, NTE disputes whether any amount is owed and, if so, how much.

Specifically, NTE contends that NTE's suspension of work under the LGIA also adjourned the "milestone payment" schedule in the LGIA's Appendix B. *See* Ex. 89; Doc. No. 214-6 at 113; Doc. No. 214-14 at 463-464. Further, there is a genuine factual dispute over whether Duke received NTE's written authorization and ignored other conditions precedent established by Sections 5.5, 5.6, 11.5, and 5.16 of the LGIA related to the suspension costs Duke seeks to recover. *See, e.g.*,

44

Doc. No. 214-7 at 162-163. Also, there is a factual dispute over whether Duke is entitled to recover "internal costs" that it has "allocated" to Reidsville, including charges for employee's meals and portions of Duke employees' salaries. In sum, there are myriad disputed issues of material facts with respect to Duke's claims for breach of contract. Therefore, Duke's motion for summary judgment on those claims will be denied.[21]

The Court will also not grant summary judgment on Duke's "account stated" claim. The elements of this claim are "(1) a calculation of the balance due; (2) submission of a statement to [the defendant]; (3) acknowledgment of the correctness of [the] statement by [the defendant]; and (4) a promise, express or implied, by [the defendant] to pay the balance due." *Carroll v. McNeill Indus., Inc.*, 250 S.E.2d 60, 62-63 (N.C. 1978). Duke's sole support for this claim is its contention that in responding to a statement of NTE's claimed balance under the LGIA, NTE allegedly "acknowledged that the statement was correct and agreed to pay" when NTE responded that the two payments totaling $7 million had not been paid and that it "need[ed] to settle up with [Duke] based on what [NTE] owe[d] to date." *See* Doc. No. 204-30 at DUKE_0004199. However, the Court finds that, at a minimum, a reasonable jury could decide that this statement is equivocal and does not reflect any acknowledgement of a debt, especially in any specific amount. Indeed, Duke's interpretation of NTE's response is expressly disputed by the author of the email. *See* Doc. No. 212 at 33. Therefore, as with Duke's claims of breach of contract, there are genuinely disputed

---

[21] Duke is similarly not entitled to summary judgment on its claim that the LGIA requires that NTE place into escrow the amount that Duke claims that NTE owes under the LGIA. The Court agrees with NTE that, fairly read, the language of Article 12.4. on which Duke relies is intended only to provide security for a transmission provider to continue service in the event of a payment dispute rather than, as Duke argues, to require NTE to pay all disputed amounts into escrow even though Duke is no longer being asked to provide services to NTE on the suspended Reidsville project.

factual issues with respect to this claim which require that the Court deny Duke's motion for summary judgment.

2.      NTE's Breach of Contract Claim

The Court will similarly deny Duke's motion for summary judgment on NTE's breach of contract claim. As to this claim, Duke does not challenge the merits of any of NTE's assertions of breach. Rather, the grounds for Duke's summary judgment motion are that NTE cannot pursue a claim for breach of contract against Duke because 1) NTE failed to notify Duke of any purported breaches or provide an opportunity to cure as required by LGIA Article 17.1.1 and 2) NTE cannot show that it suffered any recoverable damages as a result of any breach. In response, NTE argues that it was not required to provide notice of breach beyond its counterclaims in the lawsuit because after the lawsuit was filed the LGIA had been terminated and cure was not possible. Further, while NTE concedes that it has not identified specific contractual damages beyond the harm to its business related to Duke's termination of the LGIA discussed above, it argues that it is nevertheless entitled to recover nominal damages if it proves Duke breached the LGIA.

North Carolina law generally enforces valid notice and cure clauses in a contract. *See Moses H. Cone Mem'l Hosp. Operating Corp. v. Conifer Physician Servs., Inc.*, No. 1:13CV651, 2017 WL 1378144, at *4 (M.D.N.C. Apr. 11, 2017), citing *Dishner Developers, Inc. v. Brown,* 145 N.C. App. 375, 378, *aff'd*, 354 N.C. 569 (2001); *Jordan's Constr., Inc. v. Forest Springs, LLC,* 738 S.E.2d 454 (N.C. Ct. App. 2013). Article 17.1.1 ("Default") of the LGIA provides that "[u]pon a Breach, the non-breaching Party shall give written notice of such Breach to the breaching Party. Except as provided in Article 17.1.2, the breaching Party shall have thirty (30) Calendar Days from receipt of the Default notice within which to cure such Breach."

46

Article 17.1.2 ("Right to Terminate") states that:

If a Breach is not cured as provided in this article, or if a Breach is not capable of being cured within the period provided for herein, the non-breaching Party shall have the right to declare a Default and terminate this LGIA by written notice at any time until cure occurs, and be relieved of any further obligation hereunder and, whether or not that Party terminates this LGIA, to recover from the breaching Party all amounts due hereunder, plus all other damages and remedies to which it is entitled at law or in equity. The provisions of this article will survive termination of this LGIA.

Doc. No. 204-1 at 17.1.1-17.1.2. Thus, the LGIA requires the non-breaching party to give "written notice" to the breaching party, but does not mandate the form or the timing of the notice, except to say that these provisions survive the termination of the LGIA.

Accepting the application of these provisions to NTE's claims for breach of contract, the Court nevertheless finds that a jury could conclude that NTE satisfied its obligations to give Duke notice and an opportunity to cure the alleged breach. Because the LGIA does not limit how or when a party may give written notice, a jury could find that NTE's counterclaims (which Duke does not dispute provided actual notice of NTE's claims) constitute effective notice. Further, because the notice and cure provisions survive the termination of the LGIA,[22] Duke has had an opportunity to cure the various allegations of breach to the extent they could be cured.[23]

While Duke concedes actual notice, it argues that the timing of NTE's claims of breach denied it the opportunity to cure its alleged breach, particularly with respect to the alleged lack of authorization to purchase equipment. The Court finds Duke's argument as to the substantive importance of cure provisions in contracts to be persuasive; however, the ability for a contracting

_____

[22] And, in any event the LGIA was reinstated in May 2020 after FERC ruled that Duke could not terminate the LGIA without FERC's approval.

[23] In fact, it appears that several of the alleged breaches may have already been resolved by FERC's ruling reinstating the LGIA; access to books, records and other information during discovery; mediations involving senior executives; etc. At the pretrial conference in this matter the Court will determine which of NTE's specific allegations of breach of contract still require adjudication.

party to *effectively* cure an alleged breach depends not only on the right to cure but also on timely notice of the breach. However, as to the timing of notice, the LGIA falls short, only requiring that notice of breach be in writing without mandating that notice be given at any particular time following a breach. In other words, Duke would have been no better off with respect to its ability to cure an alleged breach in 2018 related to the purchase of equipment had NTE given notice shortly before Duke filed suit in 2019 rather than a few weeks later in its counterclaims.[24]

Finally, with respect to damages, the Court agrees with NTE that it may recover at least nominal damages upon proof of breach. In support of its damages argument, Duke relies on LGIA Article 18.2 which specifically prohibits the recovery of special, incidental and consequential damages. However, that provision does not mention nominal damages (and Duke has cited no authority for its argument that nominal damages are subsumed in any of the prohibited damages categories). Therefore, in the absence of a contractual agreement that NTE cannot recover nominal damages, it will be permitted to do so.

Having found that NTE can establish notice and may recover nominal damages, the Court will deny Duke's motion for summary judgment on NTE's claims for breach of contract.[25]

---

[24] Further, there are other policy implications of disallowing NTE's responsive claims for breach of contract. The Court is concerned that a rule stating that the filing of a lawsuit prohibits a party from claiming breach of contract where notice had not yet been given might create harsh and perhaps unfair consequences for a defendant surprised by a lawsuit (for example here where no period of cure is required if a breach cannot be cured). Such a defendant would, according to Duke, both be unable to assert any counterclaims for breach of contract for lack of notice, but would also lose the ability to file its contractual claims separately because they would be compulsory counterclaims under Fed. R. Civ. P. 13(a) (assuming the claims arose from the same conduct, which would be likely).

[25] The Court further notes with respect to NTE's claims for breach of contract that a number of them, including NTE's claims of lack of authorization for purchases and costs and the lack of specificity in calculating suspension expenses, are at the heart of NTE's defenses to Duke's breach of contract claims. Therefore, the Court will at the pretrial conference explore with the parties whether the substance of NTE's claims would be most cogently presented to the jury as defenses rather than separate claims for breach of contract.

## ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Plaintiff's Motion for Summary Judgment (Doc. No. 192) is **GRANTED** as to NTE's Counterclaims Counts I-IV (NTE's Sherman Act and North Carolina unfair competition claims) and otherwise **DENIED;**

2. The parties are directed to again mediate this dispute on or before July 15, 2022; and

3. This case shall proceed to trial on the merits on the remaining claims in the absence of a voluntary resolution of the dispute among the parties.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: June 24, 2022

Kenneth D. Bell
United States District Judge

49